Robert **MARTARELLA**, by his next friend and Law Guardian, Charles Schinitsky, et al., Plaintiffs,

v.

Florence **KELLEY**, Administrative Judge, the Family Court Judges of the State and City of New York, et al., Defendants.

No. 71 Civ. 3159.

United States District Court, S. D. New York.

June 13, 1973.

As Amended July 5, 1973.

2.  3A  Collier on Bankruptcy, ¶63.29, p. 1909.

Charles Schinitsky, The Legal Aid Society, Brooklyn, N. Y., for plaintiffs; Mara T. Thorpe, Brooklyn, N. Y., of counsel.

Louis J. Lefkowitz, Atty. Gen., New York City, for defendants; Samuel A. Hirshowitz, First Asst. Atty. Gen., Maria L. Marcus, New York City, of counsel.

J. Lee Rankin, Corp. Counsel, New York City, for defendant Sugarman; Yvette Harmon, New York City, of counsel.

## OPINION AND ORDER

LASKER, District Judge.

This civil rights action is brought by children defined under § 732 of New York's Family Court Act as Persons In Need of Supervision. They alleged that the conditions in which they are and have been held in the Juvenile Detention Centers of New York City, violate the Eighth Amendment of the Constitution. After a nonjury trial we held, by opinion filed October 16, 1972, that the physical conditions at Manida center were constitutionally inadequate, that they were adequate at Spofford, and that the issue as to Zerega, which had by then been closed, was moot. We also ruled that the rights of those who were held in long-term detention—a category whose definition was deferred—were violated because no adequate plan of treatment was provided for them.

In our opinion, we observed that:

"In a case of public import involving novel and delicate issues, in which developments in the very subject matter have occurred in the period between trial and decision, injunctive relief should be fashioned with deliberation. The timing of the closing of public facilities, the alteration of the programs for long termers, and determination of an acceptable definition distinguishing short and long termers are matters on which the court should not issue a decree without the considered guidance of the parties." 349 F. Supp. 575, 603.

Since the date of the opinion, the Court has conferred on a number of occasions with the parties to consider the terms of an Order. In the course of those discussions, and from analysis of briefs, separate decrees proposed by the respective parties and affidavits in support of them, it became apparent that issues of fact remained to be explored as to 1) when Manida could and should be closed; 2) the definition, in terms of days of detention, of a long termer; 3) how the right to treatment of long termers should be implemented. As a result, the Court ordered a further hearing at which Wayne Mucci, Director of the Bureau of Institutions and Facilities of Special Services for Children (a division of the Human Resources Administration of New York City), testified extensively on March 14, 1973. Mr. Mucci appeared as a witness for the defendants. Plaintiffs rely on cross-examination of Mr. Mucci and on the affidavits, briefs and proposed decrees which they have submitted. In addition to studying the papers and conducting a further hearing, the Court visited Manida for a period of some hours on March 15, 1973.

There are substantial differences between the parties as to the relief which should be afforded. 1: Plaintiffs urge that Manida be closed immediately; defendants that its use be discontinued September 30, 1973. 2: Plaintiffs contend that detention in excess of 10 days be defined as long term; defendants that detention should not be considered long term unless it exceeds 45 days. 3: Plaintiffs propose a decree specifying detailed standards of treatment; defendants argue that the decree should include no reference to treatment, either general or specific.

■ *1. Manida*: In our earlier opinion, we described (at 597) the physical conditions which rendered Manida constitutionally inadequate under the Eighth Amendment and which prompted even the defendants to stipulate that the building was inappropriate as a facility for the detention of children. These included falling plaster, peeling paint, cracks in walls and ceilings, some unuseable plumbing, roof leaks, in addition to inadequate recreational facilities and other inherent deficiencies. Since the date of the opinion remediable defects have been cured: that is, wall cracks, roof leaks and plumbing malfunction have been repaired and the interior repainted. While the defendants agree that the building is still inappropriate for detention of children, they argue that these corrections have made the structure decently habitable for a further short period, and that the Court should allow its continued use during that interval to avoid the disruption of sending its resident girls to Spofford—a boys' institution—until alternative facilities for girls, now being created, are available.

We find, as a result of our visit to Manida, that it is decently habitable for a further limited period and that the problems of placing the Manida girls in Spofford—particularly setting up separate sleeping, eating and recreational arrangements for them—are real and would cause significant disruption. Such disruption would be unjustified in light of the small gain to be accomplished during the short period of a few months being considered. Nevertheless, Manida should be closed as soon as practicable and we are not persuaded by anything in the record that such an extension should run to September 30, 1973, as suggested by the defendants. To the contrary, we find that, on the facts and testimony of the defense itself (Transcript of Hearing of March 14th, page 114), Manida can practicably be closed by August 15, 1973, and that the defendants should be held to that date.

We realize that the ability to move girls at Manida depends on a number of factors, including the completion and operation of various new small facilities. But we believe that the accomplishment of the program by August 15th is feasible, that it is more likely to occur if August 15th is set as the critical date than if not, and that constitutional rights

cannot be further deferred without a showing of impossibility of performance.

**2. *Definition of Long-Term Detention:*** The parties agree that a plan of treatment for a child held at Juvenile Center is desirable, and we have held it constitutionally necessary. The parties differ as to how long-term detention should be defined; plaintiffs proposing a ten day, and defendants a forty-five day period. Defendants argue, in effect, that if the definition of long term were set below forty-five days, the number of children to whom it would apply would be so great that the staff would be insufficient to evolve and administer plans of treatment. This argument must be rejected, first, because constitutional rights cannot be denied on account of inadequacy of government resources (Wyatt v. Stickney, 344 F.Supp. 373 (1972) and 344 F.Supp. 387 (M.D.Ala. 1972); Jones v. Wittenberg, 330 F. Supp. 707 (N.D.Ohio, W.D.1971), aff'd sub. nom. Jones v. Metzger, 456 F.2d 854 (6th Cir. 1972); Inmates of Boys' Training School v. Affleck, 346 F.Supp. 1354 (D.R.I.1972) and New York State Ass'n for Retarded Children, Inc. v. Rockefeller and Parisi v. Rockefeller, 357 F.Supp. 752 (E.D.N.Y.1973)); second, because if the argument were accepted the result would be that the larger the number of children detained for long periods—and therefore needing treatment—the higher would be the threshold of definition and the fewer the number of children receiving treatment; third, the facts and testimony submitted by the defendants themselves confirm that the threshold of definition can practicably be set well below forty-five days even within present limitations of personnel available (see, *e. g.,* Tran-

script of Hearing, March 14th, page 114).

The defendants admit "frankly —that we can handle the 30 day program" (Transcript of Hearing, March 14, 1973, page 44), and that the sole reason for proposing a forty-five day definition is that it would allow the staff to do a good job, whereas lowering the threshold would lower the quality of the program.[1] A deficiency of personnel, however, cannot be accepted either logically or constitutionally as a rationale for defining the needs of those entitled to treatment. If more staff members are necessary to do the job, the City must furnish them in order to meet its constitutional obligations.

We recognize that neither psychiatric, social work nor legal standards have advanced to a point which establish a particular definitional threshold of long-term detention as being demonstrably correct; that is, of defining the point in time beyond which holding a child in secure custody without "treatment" violates the Eighth Amendment. it is nevertheless our obligation to establish such a threshold. In doing so we must remember that the Eighth Amendment does not impose on the States the requirement of furnishing the best possible service for those in custody nor of adhering to the highest professional standard. The office of the Eighth Amendment is to assure that custodial conditions are minimally acceptable— that is, not cruel or unusual. Applying this admittedly elusive and difficult concept we find, on such evidence as the record contains, that when a child is held for 30 days or longer in secure custody without "treatment", that deprivation is of constitutional proportion;

---

[1]. The defendants properly point out that, if standards of treatment are to be set for PINS (plaintiffs here), they should be the same for the delinquent children with whom PINS are housed at the Center, even though the delinquent children are not included in the plaintiff class; that is, that the improvement for PINS should not be at the expense of JD's by diverting personnel to one group exclusively. We agree with this view, and have considered the impact of our Order on the institution as a whole.

and, accordingly, we define detention for 30 or more days as "long-term".[2]

3. *Specificity of the Order:* We agree with plaintiffs that our Order should be specific in outlining a constitutionally adequate standard of treatment at the Centers.

■ Although we share the frequently enunciated view that it is generally undesirable (both for the courts and the institutions) that courts should administer institutions, there are a number of reasons why we have concluded that in the circumstances of this case a specific Order is necessary.

In the first place, our Order does not contemplate continuing administration by the court, but rather the establishment of standards which the institution will administer just as it administers legislative or regulatory standards. Second, we rehearsed, in our earlier opinion, the sad history of ignored reports over a period of generations (culminating in the Stone and Citizens Committee Reports of 1971 and 1970), all urging reform and improvement of juvenile detention facilities, and all being largely, if not altogether disregarded and treated as mere pious sentiment.

Indeed, the 1973 Criminal Justice Plan of the Criminal Justice Coordinating Council of New York City points out that many of the deficiencies earlier noted remain. For example, it comments (at page 71) that "[b]uilt into the juvenile justice system to a far greater degree than its criminal justice counterpart is the structure for rehabilitation", "albeit a shell mostly empty of the elements necessary to accomplish this purpose." It states further, at page 84:

"Needed reforms in the Family Court far outweigh the advances made thus far. The most severe problems continue to be both the dearth of services available to the court and failure to fully utilize the aids that are at hand."

Furthermore, the very recent (December 1972) report "Designation of Facilities for the Questioning, Detention and 'Holding' of Children, Under the Family Court Act", prepared by the Subcommittee on Detention and Placement for Children of the Appellate Divisions, First and Second Departments, points up the desirability if not the indispensability of establishing specified criteria for the operations of juvenile detention facilities. For example, the Subcommittee recommends that:

"The Appellate Divisions should be supplied with the criteria upon which the New York State Board of Social Welfare and the New York State Division for Youth will base their requests for designation of a facility. These criteria should include program, staff, and physical condition of the facility, and these criteria should be part of the public record."

Appendix B to the report emphasizes (B41) the significance of physical standards and treatment standards at designated facilities. It specifies as services which are appropriate "effective educational service, conditions which are not overcrowded, removal of threat of inappropriate discipline, recreational facilities, respect for privacy and dignity of a child and his family, availability of appropriate and necessary medical, dental and even psychiatric care." We cannot ignore this history in determining the degree of specificity which the Order in this case should observe.

Furthermore, we do not believe that the standards required by our Order exceed those acknowledged by the responsible administrators to constitute minimally good professional practice, nor do we believe that they will prove burdensome to the City. To the extent that they may require further expenditure, the

---

2. As pointed out in our earlier opinion, a 30 day period was suggested by the Citizens Committee for Children of New York Inc. in its searching study of conditions at the Juvenile Centers, and reiterated in its letter of December 22, 1972 to the Court in support of defendants' request for relief.

taxpayers are called upon only to meet the constitutional rights of the City's own children. Moreover, it is desirable that all staff members of the institutions understand as clearly as possible what standards must be met, as well as the clear necessity for achieving them.

Beyond that, court specification of standards for care is no longer novel and has been recognized as the appropriate dispositional method by an increasing number of Federal Courts in cases involving disadvantaged institutional inmates. *See* Wyatt v. Stickney, *supra*; Rhem v. McGrath, 326 F.Supp. 681 (S. D.N.Y.1971); Jones. v. Wittenberg, *supra*; Inmates of Boys' Training School v. Affleck, *supra*; and New York State Ass'n for Retarded Children, Inc. v. Rockefeller and Parisi v. Rockefeller, *supra*. As stated in Swann v. Board of Education, 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1970):

> "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case."

Finally, it is appropriate to remember that administrators come and go, but institutions continue, and old and new inmates are affected by the standards of the institution. Our conclusion that the Order in this case should be specific is not intended as a reflection either on the professional skill of the present administration or its desire to do the job. Indeed, the Assistant Commissioner for Special Services for Children, and the Director of its Bureau of Institutions and Facilities have, since they acquired jurisdiction of the Centers after this suit commenced, done a distinguished job of improving the standards of care at the Centers, in instituting treatment and training plans, improving staff-child ratios and correcting the correctable at Manida. But they are political appointees, in all likelihood soon to be followed by new appointees. A clear mandate should be set for whoever occupies the positions of responsibility. Further-more, the responsibilities of other elements of the juvenile justice system—in particular, the Family Court and the Probation Department—should be defined, since one significant deficiency in the Centers' ability to treat its children-wards has been the failure by those agencies to furnish to the Centers, as rapidly as possible, all information in their possession relating to the children.

For the reasons stated above, and in our opinion of October 16, 1972, it is Ordered, Adjudged and Decreed:

1. That defendants are enjoined from failing to implement, in accordance with their respective responsibilities under law, the standards set forth in Appendix A annexed hereto and incorporated in this Order.

2. That the use of Manida Juvenile Center as a detention facility shall be discontinued no later than August 15, 1973.

3. Jurisdiction of this action is retained to assure the execution of this Order and to permit such modifications, if any, as may be necessary from time to time in the light of the rights and duties of the parties.

### APPENDIX A

1. "Long-term detention" is defined as custody of a child in a secure detention facility for 30 or more days of continuous or substantially continuous detention from the date of admission.

2. This appendix establishes minimal standards for the treatment of children held in long-term detention, as well as conditions which must occur or exist prior to the child's 30th day of detention to assure the effectiveness of the treatment plan.

3. "A secure detention facility" is defined as a facility (whether now or hereafter in existence) characterized by physically restrictive construction and procedures which are intended to prevent a child from departing from the facility at will.

4. Any caseworker employed in a secure detention facility shall possess a Bachelor's Degree and shall have taken courses in social work or the behavioral sciences, which, together with his demonstrated aptitude and work experience, shall, in the good faith opinion of the appropriate administrator of the facility, qualify him to act as a caseworker for children who have behavioral problems or are emotionally disturbed. Every caseworker shall participate in in-service training.

5. Any recreational worker employed in a secure detention facility shall have undergone training in physical education or shall possess such demonstrated aptitude and work experience as shall, in the good faith opinion of the appropriate administrator of the facility, qualify him to supervise the recreation of children who have behavioral problems or are emotionally disturbed. Every recreation worker shall participate in in-service training.

6. Any children's counselor employed by a secure detention facility shall possess a high school diploma and have completed two years (60 credits) of college education. He shall have performed two years of community or institutional work with children and shall possess a demonstrated aptitude which, in the good faith opinion of the appropriate administrator of the facility, qualifies him to act as a counselor for children who have behavioral problems or are emotionally disturbed. Every children's counselor shall participate in in-service training.

7. In-service training shall consist of (a) appropriate orientation to agency rules, procedures and policies and, special needs including therapeutic approaches, of children who have behavioral problems or are emotionally disturbed and who are confined in secure detention and (b) a continuing program of seminars or work shops, conducted by persons with appropriate experience, for the purpose of developing special skills and methods of dealing with such children.

8. "Treatment" is defined as a therapeutic living situation for a child, including his grouping with other children; the adequacy and competency of staff members dealing with him or his case; diagnosis of his emotional and psychological needs and on the basis of such diagnosis and all other information about the child that is available, and the provision of appropriate mental health, case work, educational, recreational and medical services for him.

9. A child confined to a secure detention facility shall be afforded treatment appropriate to his individual need as determined by a suitably constituted team of staff members who have responsibility for his case.

10. On the day the child is remanded by the Family Court to a secure detention facility, the Family Court Judge and the Probation Department shall cause to accompany him a copy of the social information compiled by the Probation Department from any source including prior probation records, interviews with the child, family, guardian or any public or private agency having previous knowledge of the child, as for example, schools, mental hygiene or child guidance clinics, Department of Social Services or hospitals.

11. All reasonably available information of the type described in Paragraph 10 above, which has not been collected by the Probation Department and forwarded to the secure detention facility on the day of the child's admission, shall be obtained and forwarded as soon as practicable after the child's admission.

12. As soon as practicable after the child's admission to a secure detention facility, he shall be assigned to and confer with a caseworker who has reviewed the material received from the Probation Department referred to above. That caseworker shall remain the child's caseworker during his confinement to the extent that his doing so will not interfere with the establishment of the working team referred to in Paragraph 13 below and its ability to carry out its function.

13. As soon as practicable after the admission of the child to a secure detention facility and no later than 10 days thereafter, he shall be observed and evaluated for the purpose of assignment to a permanent living unit. Such evaluation and determination shall take into consideration all relevant factors including his maturity, emotional development, emotional and psychiatric history, findings of fact, or, if they are known, the charges against him, and evidence of drug use and shall not be made on the basis of age, size and aggressiveness only. The evaluation and assignment process shall be conducted by a team including, to the extent appropriate, a caseworker, counselor, teacher, psychiatrist or psychologist and physician. The assignment and interim treatment plan developed, and the reasons therefor, shall be in writing, signed by the person responsible for leading the team, and a copy of the plan shall be given to the child's Probation Officer, and, if authorized by the child, to his attorney or law guardian. Unless the counselor on the permanent living unit was a member of the evaluation team, the person responsible for leading the team shall give the counselor an interpretation of the child's need and such information as is necessary to ensure appropriate handling of the child.

14. Each child shall be afforded no less than two hours a day on school days, and three hours a day on non-school days, of planned and structured recreational activity.

15. Each child shall be afforded reasonable access to a psychiatrist in accordance with his needs in appropriate instances including consultation and crisis intervention.

16. A child who attempts suicide shall be afforded immediate treatment in a psychiatric hospital unless a psychiatrist examines him immediately after his attempt and states in writing that such hospitalization is not necessary.

17. Each child shall be afforded an individualized treatment program including the components listed below in Paragraphs 18 through 26.

18. Each such child shall be assigned to a living unit, therapeutic for him as determined by the evaluation team, and containing no more than the number of children which can be appropriately cared for on the basis of their individual needs.

19. There shall be no less than two counselors for each 20 children.

20. There shall be no less than one recreation worker for each 15 children during recreational activities.

21. There shall be no less than one caseworker for every 15 children. When a child is returned to the detention facility after a period of release, he shall be reassigned to his last caseworker whenever practicable.

22. The child's caseworker shall confer at reasonable intervals with the child's counselor.

23. No later than the 20th day of a child's confinement, there shall be a full case conference between the child's counselor, caseworker, probation officer, and any examining or treating psychiatrist or psychologist and one of the child's teachers, at which an individualized long treatment plan shall be formulated and recorded. Each child held in long-term detention shall have the right to implementation of such long range treatment plan to the fullest possible extent.

24. A full case conference as to the child shall be held thereafter at suitable intervals to review his treatment plan and progress and to provide such revisions in the plan, if any, as are determined necessary. Each such conference shall be reported in writing and any revisions determined shall be implemented as indicated.

25. A complete file for each child shall be maintained and shall contain a copy of all reports referred to in the paragraphs above, and shall be available to personnel having direct responsibility for the child. All information contained in such file shall be considered privi-

leged and confidential. A summary of the pertinent findings in such file shall be sent to the child's Probation Officer. On consent of the child, his attorney or law guardian shall be permitted access to the file.

26. There being no dispute as to the value of the appointment of an independent ombudsman to hear and act on grievances of children held in long-term detention, the administrator of the secure detention facilities shall within 30 days of the filing of this Order submit to the Court a plan for the appointment of such an official. The plan shall include a description of the qualifications and duties of the ombudsman and procedures for his appointment.

27. When the masculine is used in this appendix, it shall be construed to include the feminine.

28. The provisions of Paragraphs 1 through 27 above, shall become effective July 14, 1973.