J. George Follett, J.
This decision interprets and applies section 255 of the Family Court Act.[1] The Law Guardian for Edward M, who has been adjudicated a juvenile delinquent, has requested an order pursuant to section 255 directing the Commissioner of Social Services of St. Lawrence County to “ render assistance and cooperation ” to the Family Court by providing a suitable foster home for his client.[2] Following the *782 request, the case was scheduled for an “ evidentiary hearing ” to determine whether or not facts existed which would warrant such an order.[3]
At the commencement of the hearing, the' Assistant County Attorney, representing the Commissioner of Social Services, moved to dismiss the proceeding so far as the commissioner was concerned for the reason that he had not been properly made a party to the proceeding. However, all parties had due notice and were before the court. No party claimed that he was not ready to proceed. There seemed to be no purpose in delaying the matter in order that a more appropriate procedure ■be followed in initiating the hearing. The motion was denied.[4]
Then the Assistant County Attorney moved to dismiss the proceeding, claiming that the Family Court has no power to enter an order directing the Commissioner of Social Services *783 to take any specific action. He argued that such authority is vested solely in the Supreme Court pursuant to a proceeding under article 78 of the CPLR. The Law Guardian in response thereto relies upon the 1972 amendment to section 255 (L. 1972, ch. 1016) of the Family Court Act which, he says, specifically authorizes the Family Court to “ order * * * any * * * county * * * officer * * * to render such assistance and cooperation as shall be within his legal authority, as may be required, to further the objects of this [Family Court] act.”
The 1972 amendment was introduced in the New York State Legislature by Assembly Speaker Perry B. Duryea, Jr., following the receipt of the report of the Assembly Select Committee on Child Abuse in April of that year.[5] It is to the report of that committee that we turn to discern the meaning of the amendment.
The report of the Select Committee makes no specific mention of an amendment to section 255 of the Family Court Act. The principal thrust of the Select Committee’s investigation was child abuse, its interception and treatment. However, the committee recognized the significant role that Family Court plays in the interception and treatment of child abuse. The committee noted that “ the Family Court is * * * the lynch pin upon which the entire out-of-court system depends.”[6]
The committee devoted careful attention to the Family Court and its need for services. The committee stated that “ The Family Court is, in many ways, a unique court, dependent upon numerous outside agencies to make its processes effective.”[7] The committee quoted from an earlier New York State Senate’s study as follows: “ Compounding the difficulties confronting the Family Court judge is the absence of adequate supporting services. From adjudication to disposition, the Family Court judge is ‘ dependent upon the cooperation and assistance of other municipal agencies and private social agencies, so often understaffed and ill equipped to meet even the minimum needs and demands of this court, [contributing] heavily to its inability to become the social forum it was designed to be ’. ’ ’[8] The committee emphasized the need for effective support services by reporting the tragic case of Gladys M., a child who was the subject of a neglect petition which had been pending before the Family Court for six months when the child was suddenly found *784 dead as the result of “ burns, battering, and malnutrition.” Regarding that ease, the committee concluded: ‘ ‘ Although a less rushed Family Court judge might have been able to catch this situation in the earliest stages of the case, it is clear to this Committee that the death of Gladys would have been avoided had the Court’s supporting services not allowed delays and lack of information to compromise the Court’s efforts. Until it was too late, the judge was not appraised of the true danger to the children; he was not appraised of the history and conduct of Mr. and Mrs. M. He had no way of knowing that this case required his priority attention.” (Emphasis in original.)[9]
The committee documents the fragmentation and lack of co-ordination of court service agencies. It stated: “ The fragmented patchwork of child welfare agencies is responsible for lack of communication, inefficiency and inadequate service. The list of agencies in itself reveals the splintering of services. A family in trouble too often gets lost in the maze of agencies. Repeating their problems over and over again to social worker after social worker becomes frustrating, annoying, and destructive to any helping relationship.”[10] It is in the context of these deficiencies that the amendment to section 255 was born.
It appears significant that the committee, in providing the court with added authority, chose to locate that authority in article 2 of the Family Court Act instead of article 10. This positioning recognized the over-all need of the court to control the various service agencies upon which it must rely. Thus, in-the section 255 amendment, the committee was addressing a deficiency which has long plagued the Family Court. The committee quoted Professor Foster of New York University Law School as follows: “ The practical problem for the juvenile court judge at the dispositional stage is whether or not he has a real choice. It.may be a Hobson’s choice. Available facilities may be post-graduate schools of crime, or there may be no bed space, an inadequate staff or an obsolete institution. Probation officers may be so overloaded with cases that their services are meaningless. Return to the home environment may be hazardous. And in the background is the uncertainty of the efficacy of treatment and doubt concerning the various techniques for influencing human behavior. The juvenile court judge is the living example of having to ‘ make do ’. The failure of the ‘ impossible dream ’ to infuse social work philosophy into juvenile court procedures in no small measure is due to the fact *785 that the public has never provided the essential resources for the implementation of the idea. Foster, ‘ Notice and Fair Procedure: Revolution or Simple Revision? ’ In Gault: What Now For The Juvenile Court 51, 68 (1968) ”[11]
Returning then to the argument of counsel, it appears that the Select Committee intended that section 255 become a useful tool to the Family Court. Section 255 was designed as a specific remedy to enable the court to cut through the bureaucracy, fragmentation and lack of co-ordination which so inhibits the provision of services for families and children before the court.[12] When a specific statutory remedy exists, it is unnecessary and inappropriate to proceed under article 78 of the CPLR.[13]
A question remains as to how far the Family Court may go in ordering the assistance and co-operation of its service agencies. The statute establishes a twofold standard: “ It is hereby made the duty of, and the family court or judge thereof may order, any state, county, and municipal officer and employee to render such assistance and cooperation [1] as shall be within his legal authority [2] as may be required, to further the objects of this act.”
The first standard requires no interpretation. The second standard requires discussion. The term “ as may be required,” reveals the dimensions of the court’s authority. “ As may be required ” must be first determined by the circumstances of the case before the court. The order should not go beyond that *786 which is necessary to remedy the problem presented. This requires a factual inquiry to establish the specific services needed.
“ As may be required ” also relates to the circumstances of the officer or agency which has the legal authority to provide services. Therefore, it is also necessary to inquire into those circumstances before any order is entered. Otherwise, the order might be inadequate to remedy the problem or unreasonably burdensome to the officer or agency from whom assistance is sought.
The principle of reasonableness should be applied.[14] The need for services should be balanced against the circumstances of the officer or agency. The nature and extent of assistance ordered should be adjusted accordingly.
In many cases the extent of court intervention would be minimal.[15] In certain cases, the need may be so great that the solution thereof may cause some disruption in the traditional modes of offering services by the officer or agency.[16]
Counsel argues that the Family Court cannot conduct “ a general review of the administrative procedures and policies of the Department of Social Services ”. I am mindful of the rule applied in article 78 proceedings that the court should not substitute its judgment for the judgment of those whose duty it is to administer agencies and institutions.[17] However, under section 255 that rule may be superseded in a particular case where the nature and urgency of the need presented and the consequences of the failure to provide services require court action.[18] This is particularly true when the root cause of the *787 difficulty is administrative inaction as distinguished from a dispute over the appropriateness of a particular action. Thus, in a given case, the officer may not hide behind a shield of insufficient time, inadequate staff, insufficient funds, or mere rhetoric. Under section 255 the court is given the authority to order the officer into action so that the needs of people before the court can be met.
In summary then, in this case, before this court enters an order directing the assistance and co-operation of the Commissioner of Social Services of this county, it is first necessary to establish the specific services needed. Next, it is necessary to determine whether or not it is within the “ legal authority ” of the Commissioner of Social Services to provide these services. Then, the circumstances of the commissioner and his department relating to the provision of those services should be established. Next, it is necessary to balance the specific needs for services against the particular circumstances of the commissioner and his department so that the order, if one is required, be reasonable and appropriate.
Applying these principles to the case at hand, it is clear that Edward M., at the time of the application for relief, was in need of a suitable foster home. There were three alternatives available: release him to the care of his parents, place him in a foster home, or place him in an institution. The first of these alternatives was not acceptable. His mother did not want him home because of her admitted inability to control him. "While at home on visits from the State Hospital foster home, he demonstrated that he was unable to control his behavior or respond to the advice or guidance of his parents.
The alternative of institutional placement was bleak indeed. There was no recommendation that he be placed in institutional care. The goal of juvenile treatment programs is rehabilitation in the community. Institutional treatment is the choice of last resort, appropriate only where behavior is so extreme as to render community based treatment ineffective or the community unsafe. The objections of the Law Guardian to the institutional alternative were most appropriately taken. *788 With both release to parents and institutional placement ruled out, the only alternative left and indeed the program of choice, was placement in a suitable foster home.
This conclusion has been sustained by subsequent events. Edward M had been detained in a nonsecure detention foster home pending the outcome of this proceeding. In this home he received discipline, sympathetic guidance and understanding. Through counseling and encouragement, Edward M has been released from the nonsecure detention home and returned to the home of his parents. The prognosis on his adjustment at this time seems favorable. He has re-entered school, he seems to relate adequately to his parents and other members of his family.
From the point of view of Edward M, the issues presented in this proceeding are now moot. But the matter is hardly moot for other children still in detention and awaiting foster placement, not to mention those who may hereafter become in need of suitable foster care. For these children, the case continues to have far-reaching consequences. It is, therefore, proper and necessary to continue to a determination of the issues presented.[19]
There is no dispute that it is within the legal authority and is in fact the duty of the St. Lawrence County Commissioner of Social Services to receive placement of a delinquent child for foster home care.[20]
Proceeding then to an examination of the circumstances of the St. Lawrence County Department of Social Services relating to the provision of foster homes for juvenile delinquents, the hearing revealed that the responsibility for finding foster homes for children rests in the Home Finding Unit of the department. That unit is one of several units located within the Division of Child Welfare Services. The Home Finding Unit has a normal staff of three persons and has essentially three functions : boarding home finding, boarding home certification, and boarding home recertification.
Prior to May 26, 1973 the Home Finding Unit performed these functions for some 300 children of all ages who were voluntarily placed by parents or who were placed pursuant to orders of this court in neglect or abuse proceedings. Before that date, the primary responsibility for locating foster homes *789 for juvenile delinquents and persons in need of supervision in St. Lawrence County had been assumed by the Probation Department. On May 26, 1973 the responsibility was turned back to the Department of Social Services for various reasons not particularly relevant here.
Also at that time, there existed a staff vacancy in the Home Finding Unit so that there was but one caseworker to perform all of the various duties of that unit. The vacancy was not filled until July of 1973. In the meantime, several applications for foster homes for juvenile delinquents or persons in need of supervision, including an application for Edward M, had been made to the Commissioner of Social Services. The supervisor of the Home Finding Unit responded to these applications by reviewing the pool of foster homes which it had theretofore accumulated for voluntarily placed, neglected, and abused children. She then asked selected foster parents on the list if they would accept a juvenile delinquent. With only one exception, the answer was no. That home was determined unsuitable for Edward M.
It is significant to note the different approach which the department follows in placing a behavior problem child of adolescent age who had not been adjudicated a juvenile delinquent or person in need of supervision. In that instance, the needs of the child are carefully assessed. The strengths and weaknesses of a particular foster family are reviewed. The prospective foster parents are contacted and told. about the child. The child usually goes on one or more pre-placement visits, sometimes for a weekend, to see how he fits in with the prospective foster family.
This was a procedure approved by the commissioner himself regarding a juvenile delinquent. He advised that it was necessary to use ‘ ‘ salesmanship and diplomacy ’ ’ and to use encouragement in “ asking these people, would you be willing to assist us in this way of providing a home for this child, give him a chance to make something for himself rather than just perhaps be put into a state institution.”
This is in marked contrast to what was done. In fact, as of July 25, 1973 two months after the request, the grade A supervisor in charge of Child Welfare Services acknowledged, “ We haven’t specifically looked for a home for Edward [M].” Furthermore, the unit supervisor testified that the one fieldworker on staff had not been given any specific information concerning Edward M.
The testimony of both the grade A supervisor and the Home Finding Unit supervisor is in direct conflict with Exhibit 3 *790 where the same witnesses stated “ We regret to advise that we have diligently searched for a foster home for Edward M and have not been able to find a foster parent willing to provide a home for this boy.”
Viewing the operation of the unit as a whole, its failure to respond effectively to requests for foster homes for juvenile delinquents becomes understandable. There are no specific job descriptions for any of the positions in the Home Finding Unit. The unit does not have any training manual for staff personnel. The department has no in-service training program for its grade B supervisor in charge of foster home finding or for the caseworkers assigned to that unit.
Nor is there any training program for foster parents wherein they might be encouraged to accept placement of juvenile delinquents and be prepared to meet the needs of such children. Nor was any consideration given to increasing the payment made to foster parents for caring for juvenile delinquents even though there was testimony that such increased payments might be helpful in producing additional foster homes for these children.
Furthermore, the testimony reveals that no time was spent in recruitment of foster homes as required by State regulations. Nor was there any program for working with the Probation Department to determine the needs of a specific child in order that suitable placement be made. The vacancy in the unit was not filled for nearly four months, and no clear reason was given why it was not filled.
Balancing the need in this county for foster homes for juvenile delinquents, let alone the need for a viable foster care program for other children who come to the attention of this court, against the circumstances of the Department of Social Services of this county, it is apparent that different standards and new procedures must be adopted. No child should be permitted to remain indefinitely in the uncertainty of a detention home, nor should any child be returned to his own home if needed care and supervision is lacking. Nor should any child be instutionalized solely because foster care has not been made available.
Although different standards and new procedures may cause some temporary dislocation within the agency, such may be inevitable if an adequate foster home program is to be made available in this county. Correcting many of the deficiencies noted above would not involve an expenditure of large sums of money. Any expenditure would likely be more than offset by placing just one child in institutionalized care for only one *791 year.[21] Furthermore, information on acceptable standards and procedures relating to foster care is readily available to the agency.[22]
This court will not at this time undertake to delineate the standards or set forth the procedural changes which should be adopted by the Department of Social Services. Rather, a conference will be called in order that all ramifications of the problem be discussed and explored.[23]
The department must then initiate its own plan for change. The plan must be reduced to writing, must be filed with the court, and must meet each and every readily foreseeable contingency involved in the placement of a juvenile delinquent or person in need of supervision in foster care, including an ongoing training program for foster parents. The plan must contain a time schedule for its implementation. Furthermore, it must be prepared in consultation with the St. Lawrence County Probation Department in order that the duties and efforts of these two units of county government be fully co-ordinated.
The plan must be submitted within three months. A hearing will then be held to determine if the plan, once implemented, can be reasonably expected to meet the needs described herein.

. Section 255 of the Family Court Act provides as follows:
“ It is hereby made the duty of, and the family court or a judge thereof may order, any state, county and municipal officer and employee to render such assistance and cooperation as shall be within his legal authority, as may be required, to further the objects of this act. It is hereby made the duty of and the family court or judge thereof may order, any agency or other institution to render such information, assistance and cooperation as shall be within its legal authority concerning a child who is or shall be under its care, treatment, supervision or custody as may be required to further the objects of this act. The court is authorized to seek the cooperation of, and may use, within its authorized appropriation therefor, the services of all societies or organizations, public or private, having for their object the protection or aid of children or families, including family counseling services, to the end that the court may be assisted in every reasonable way to give the children and families within its jurisdiction such care, protection and assistance as will best enhance their welfare.”

. Edward M was adjudicated a juvenile delinquent on January 4, 1972. On the same date, he was admitted for treatment to the Adolescent Unit of the St. Lawrence State Hospital. On April 18,1972 at a dispositional hearing, Edward M was placed in the custody of the Commissioner of Social 'Services for a period *782 of 18 months under the supervision of the St. Lawrence County Probation Department. At that time, Edward M was still a patient at the Adolescent Unit, and it was contemplated that he would continue in that treatment program until he was ready to be discharged. He was then to be placed in a foster home operated by the Adolescent Unit if possible; and if not, then the Probation Service was to arrange placement in a foster home approved by the St. Lawrence County Department of Social Services.
The testimony in the present proceeding revealed that Edward M was in fact placed in an Adolescent Unit foster home on April 21, 1972. He made a good adjustment in the foster home setting. Edward M. continued to function well until he visited his own home during the Christmas Holiday period of 1972. Following that and subsequent visits, his behavior in the foster home and in school deteriorated.
On May 17,1973 a caseworker for the Adolescent Unit determined that Edward M could no longer stay at their foster home, and he was thereupon returned to the home of his parents. There followed a series of incidents which resulted in his being temporarily placed in a nonsecure detention home operated by the Probation Service of this County.
On May 24, 1972 a written request was made by the Probation Service to the Commissioner of Social Services for the designation of a foster home for Edward M. By letter dated May 31, 1973 the Department of Social Services responded to the request as follows: “ We regret to advise that we have diligently searched for a foster home for Edward M and have not been able to find a foster parent willing to provide a home for this boy. We are aware of your needs and will contact you if we have any openings in the future.”
Further correspondence concerning the matter passed between the Probation Department and the Department of Social Services; and on June 11, the Director of Probation of this county filed a modification petition seeking to be relieved of the responsibility of providing supervision for the respondent. It was upon the return date of this petition that the Law Guardian moved for an order pursuant to section 255 of the Family Court Act directing the Commissioner of Social Services to provide a home for Edward M.

. Usen v. Sipprell (41 A D 2d 251 [4th Dept., April, 1973]).

. Family Ct. Act, § 165; CPLR 2001.

. Report of the Select Committee on Child Abuse, New York State Assembly, April 1972. (Hereinafter referred to as the Select Committee Report.)

. Select Committee Report, p. 121.

. Ibid., p. 142.

. Ibid., pp. 126-127.

. Ibid., pp. 131-132.

. Ibid., p. 83.

. Ibid., p. 133.

. A letter was directed to Hon. Peter J. Costigan, present Chairman of the Select Committee, requesting information on legislative intent. A response was received from Douglas J. Besherov, Executive Director, the pertinent part of which is as follows: “ As we understand the intent, the Legislature sought to give the Family Court authority to require the agencies described to perform those duties prescribed or made their responsibility by law to perform. For example, when a local Department of Social Services is legally responsible for making arrangements for a family’s shelter, a Family Court Judge might order the Department to do so. For example, since the Child Protective Services Act of 1973 requires local departments to provide specified services to families and the Family Court, a Family Court Judge might order the' Department to do so. For example, if a child-care agency is legally responsible for the care of certain children, if it refuses to accept them, a Family Court Judge might order the agency to do so. Obviously, the possibilities are limited only by the types of eases that come before the Court and the legal responsibilities of agencies.”

. Matter of Phalen v. Theatrical Protective Union No. 1 (22 N Y 2d 34, cert. den. 393 U. S. 1000); Matter of Thurman v. Snowden (28 A D 2d 705); Matter of Towers Mgt. Corp. v. Thatcher (271 N. Y. 94, 97); People ex rel. Broadway & 96th St. Realty Co. v. Walsh (203 App. Div. 468, mot. for Iv. to app. den. Jan. 16, 1923).

. Note the final sentence of section 255 of the Family Court Act which provides that “ the court is authorized to seek 6 6 45 cooperation * * * in every reasonable way to give the children and families within its jurisdiction such care, protection, and assistance as will best enhance their welfare.” (Emphasis supplied.)

. Matter of Norman C. (74 Misc 2d 710); Matter of Anthony W. (74 Misc 2d 380); Matter of John M. (75 Misc 2d 672); also, see, “Advocacy for Children’s Services in Family Court” by Michael A. O’Connor (N. Y. L. J., Sept. 20, 1973, p, 1, col. 3).

. Usen v. Sipprell (41 A D 2d 251); Matter of Ellery C. (32 N Y.2d 588); also, see, “Advocacy for Children’s Services in Family Court” (supra).

. Matter of Gimprich v. Board of Educ. of City of N. Y. (306 N. Y. 401); Matter of Posner v. Levitt (37 A D 2d 331).

. No administration of the County Department of Social Services is contemplated here. However, specific court ordered standards may be required which will insure the provision of needed services to the court. This approach was adopted in Matter of Martarella v. Kelley (359 F. Supp. 478, 482) where the court said: “Although we share the frequently enunciated view that it is *787 generally undesirable (both for the courts and the institutions) that courts should administer institutions, there are a number of reasons why we have concluded that in the circumstances of this case a specific Order is necessary. In the first place, our Order does not ■ contemplate continuing administration by the court, but rather the establishment of standards which the institution will administer just as it administers legislative or regulatory standards.” Upon the use of section 255 to compel the provision of needed services, see Matter of Jeanette M. (40 AD 2d 977); also, cf. Matter of Ellery C. (32 N Y 2d 588).

. East Meadow Community Concerts Assn. v. Board of Educ. of Union Free School Dist. No. 3 (18 N Y 2d 129, 133); Matter of Concord Realty Co. v. City of New York (30 N Y 2d 308, 312).

. 'Social Services Law, § 398.

. According to information supplied by the New York State Division of Youth, the current cost of maintaining a juvenile delinquent in a training center is $40.34 per day or $14,724 per year. 50 percent of this must be paid from local funds.

. See Foster Care in Question, a publication by the Child Welfare League of America, 1970.

. Cf. Matter of Martarella v. Kelley (349 F. Supp. 575; 359 F. Supp. 478).