138 N.J. Super. 383 (1975)
351 A.2d 43
STATE OF NEW JERSEY IN THE INTEREST OF D.F., A JUVENILE.
Superior Court of New Jersey, Juvenile and Domestic Relations Court, Camden County.
November 3, 1975.
*386 Mr. Isaiah Steinberg for the juvenile D.F. (Messrs. Weinberg, Fishman & Steinberg, attorneys).
Mrs. Shirley Tolentino, Deputy Attorney General, for the Division of Youth and Family Services, Department of Institutions and Agencies (Mr. William F. Hyland, Attorney General of New Jersey, attorney).
PAGE, P.J.J.D.R.C.
The juvenile, D.F., is a 15-year-old boy who has been adjudicated delinquent on 17 separate charges of breaking, entering and larceny. He is before the court for placement, after extensive dispositional hearings.
D.F. is the second of eight children. His father is a salesman and his mother a housewife. Although his I.Q. has ranged, in testing, from 118 to 135, the boy has had considerable problems at school. He has last attended the tenth grade in Haddonfield High School. This community has upper-middle to upper class families with a strong school system.
D.F. first became known to the juvenile justice system when, at age 13, he appeared before the juvenile conference committee on a charge of bicycle theft. Prior to this time he had a number of psychological evaluations and was in therapy at a local guidance clinic.
From the time of his appearance before the juvenile conference committee, up to his present offenses, he underwent psychotherapy with Dr. L.J. Byerly. Dr. Byerly is a well-respected child and adolescent psychiatrist in the South Jersey area. He is board-certified in both child and adult psychiatry and his academic credentials include professorships *387 at Columbia and University of Pennsylvania Medical College, as well as a number of medical publications.
It is his opinion that D.F. suffers from a major psychiatric disturbance which he diagnosed as "a Narcissistic Personality with borderline features." Dr. Byerly stated that D.F. has been psychotic at certain times. It was his considered judgment that unless the boy receives intense individual psychotherapy in an institutional setting, he could move into an irretrievable psychotic condition.
Dr. Byerly stated, "I would hospitalize D.F. [in an] advanced psychiatric facility." He recommended The Institute of Living at Hartford, Connecticut, or the Institute of Pennsylvania Hospital. He noted that whatever placement was made for D.F. would have to include a full range of psychiatric services, including group and individual, and chemotherapy.
With respect to possible incarceration of D.F. at the State Training School For Boys at Jamesburg, Dr. Byerly felt that any type of penal incarceration would cause D.F. to withdraw and go into a depressive state, leading to a more permanent psychosis. When questioned about a residential placement in a private preparatory school such as George Junior Republic, Dr. Byerly maintained that this would not be adequate to meet his psychiatric needs.
James McFalls, a caseworker with six months' experience, testified on behalf of the State Division of Youth and Family Service (hereinafter, the Division.) It was his agency's recommendation that the boy be placed in George Junior Republic, even though he admitted that he did not know specifically the services provided there and had never, in fact, placed a child in that private school.
On recall by the court, after Dr. Byerly's testimony, McFalls candidly admitted that it was his personal opinion that the boy needed the treatment provided in a psychiatric institution in preference to a residential school. Neither McFalls nor Deputy Attorney General Tolentino could present *388 the court with an alternative for D.F. but stated that his case was still under consideration in Trenton.
Mrs. Marilyn Sebastian testified as an officer from the Family Intake Unit of the Juvenile Court. She was a juvenile probation officer 4 1/2 years prior to becoming an intake officer ten months ago. She has placed a number of children in both George Junior Republic and psychiatric facilities, including the institutes recommended. It was her opinion that George Junior Republic was not an appropriate placement as it does not have the kind of psychiatric facilities available to handle D.F.
Dr. Barbara Messick testified as the school psychologist of the Haddonfield school district. She has considerable experience working with children and adolescents, both in the school district and previously at the Bancroft School. She noted that "[a]n emotional disturbance is holding down his I.Q. and functioning." She testified that it was the opinion of the child study team from Haddonfield that D.F. receive immediate placement in a structured, contained psychiatric facility. She said he needed intensive individual therapy, rather than penal institutionalization. Dr. Messick was of the opinion that something must be done immediately and even recommended that D.F. be held in the children's shelter until a bed could be found for him in a psychiatric institution. She felt that the Haddonfield school district would be willing to pay its share of the costs at a residential psychiatric facility under the Beadleston Act, N.J.S.A. 18A:46-2 et seq.
Following certain initial findings and determinations of this court, a supplemental dispositional hearing was held. At that hearing Mrs. Sebastian was recalled and testified that she had contacted the George Junior Republic School in New York and was advised that there were no psychiatric services available. She further advised that she had applied on behalf of D.F., to the three psychiatric facilities mentioned in the testimony, The Institute of Living at Hartford, Connecticut, The Institute of Pennsylvania Hospital *389 and Devereaux Institute. She had received rejections from both The Institute of Living and Devereaux. The Institute of Pennsylvania Hospital accepted D.F. and was willing to place him immediately.
After consideration of all the material presented in the dispositional hearings and a thorough review of D.F.'s file, certain factual determinations can be made. This boy is suffering from a severe emotional disorder that requires immediate treatment in a structured psychiatric facility. D.F. is not an appropriate candidate for incarceration at a state training school. The lack of prompt and adequate treatment may very well result in his becoming irreversibly psychotic. The type of treatment needed is intense psychotherapy. This is not available at the private school, George Junior Republic, which was the only recommendation given by the Division. D.F. must have a residential placement at a psychiatric institute such as The Institute For Living, The Devereaux Institute or The Institute of Pennsylvania Hospital.
The primary question presented is whether the Juvenile Court can order the Division to place the child in a specific private residential facility for the treatment of his psychiatric illness. A corollary of this issue is the juvenile's "right to treatment" under the juvenile justice system.
Juvenile Courts were established to substitute rehabilitative treatment of the juvenile for penal incarceration. Under the common law theory of parens patriae, "[t]he right of sovereignty imposes a duty to protect the public interest and to protect such persons with disabilities who have no rightful protector," Johnson v. State, 18 N.J. 422, 430 (1955).
The State of Illinois was the first in the nation to create a separate system of juvenile courts, Law of April 21, 1899, §§ 1-26, (1899) Ill. Laws 131 (repealed 1965). This was for the purpose of substituting aid and education for the punishment meted out by the adult courts. By 1925 all *390 but two states, Maine and Wyoming, had juvenile court statutes. Mennel, Thorns and Thistles 132 (1973).
New Jersey established a separate court for juvenile offenders in 1903. L. 1903, c. 219. In 1929 the parens patriae underpinnings of the juvenile court were recognized legislatively. The preamble to the juvenile statute stated that "[t]he purpose of [the statute] is * * * when [a] child is removed from his own family to secure for him custody, care and discipline as nearly as possible equivalent to that which should have been given by his parents." L. 1929, c. 157, § 1. This purpose is restated in the current statute, N.J.S.A. 2A:4-2.
Under the 1929 statute, and also under its successor, N.J.S.A. 2A:4-1 et seq., the courts have continued to recognize the mandate of the Juvenile and Domestic Relations Court to exercise its parens patriae power on behalf of its adjudicated children. Johnson v. State, 18 N.J. 422 (1955), cert. den. 350 U.S. 942, 76 S.Ct. 318, 100 L.Ed. 822 (1955); State v. L.N., 109 N.J. Super. 278 (App. Div. 1970), aff'd 57 N.J. 165 (1970), cert. den. 402 U.S. 1009, 91 S.Ct. 2194, 29 L.Ed.2d 431 (1970). It is this obligation which requires the court to assure itself that a juvenile adjudicated delinquent will get effective rehabilitative treatment, and to choose a dispositional alternative most likely to achieve that result.
Beyond the common law parens patriae obligation of the court, constitutional rights of due process and equal protection require that an adjudicated juvenile obtain effective rehabilitative treatment.
In Rouse v. Cameron, 125 U.S. App. D.C. 283, 373 F.2d 451 (D.C. Cir.1966), the court held (at 453) that failure to supply treatment may raise a question of due process or may violate equal protection. Other courts have since expanded this concept, holding that due process requires the provision of therapeutic treatment to juveniles adjudicated delinquent, Nelson v. Heyne, 491 F.2d 352 (7 Cir.1974), cert. den. 417 U.S. 976, 94 S.Ct. 3183, *391 41 L.Ed.2d 1146 (1974); Martarella v. Kelley, 349 F. Supp. 575 (S.D.N.Y. 1972); Inmates of Boys' Training School v. Affleck, 346 F. Supp. 1354 (D.R.I. 1972).
The Court in Nelson v. Heyne, supra, noted:
In our view the "right to treatment" includes the right to minimum acceptable standards of care and treatment for juveniles and the right to individualized care and treatment. Because children differ in their need for rehabilitation, individual need for treatment will differ. When a state assumes the place of a juvenile's parents, it assumes as well the parental duties, and its treatment of its juveniles should, so far as can be reasonably required, be what proper parental care would provide. Without a program of individual treatment the result may be that the juveniles will not be rehabilitated, but warehoused * * *. [491 F.2d at 360]
Inherent in this principle is the "implication * * * that effective treatment must be the quid pro quo for society's right to exercise its parens patriae controls." Martarella v. Kelley, 349 F. Supp. 575, 600 (S.D.N.Y. 1972). Such controls may include the removal of a juvenile from his home and placement in a foster home, or even compelling him to undergo psychotherapy or family counseling. Specific adult criminal procedural rights given up by the juvenile include the preliminary probable cause hearing, the right to indictment and to trial by jury.
The Juvenile and Domestic Relations Court, by virtue of its parens patriae responsibility, has not only the right but indeed a solemn duty to exercise its statutory and inherent powers in obtaining effective treatment for its adjudicated juveniles. This duty cannot and will not be delegated to an agency with powers much more strictly delimited than those of the court.
Turning to the applicable statute, N.J.S.A. 2A: 4-61, it is clear that the court has the power to specify the place of treatment of a juvenile adjudicated delinquent. It can, for one, order placement in a specific institution as a condition of probation, under N.J.S.A. 2A:4-61(c). State in Interest of M.H., 131 N.J. Super. 288 (App. Div. 1974). *392 It may also "commit the juvenile to a suitable institution for the treatment of mental illness," N.J.S.A. 2A:4-61(g), or may make any "such other disposition not inconsistent with this act as the court may determine," N.J.S.A. 2A:4-61(i).
However, although these alternatives exist in fact, lack of available financial resources, other than those of the Division, makes placement of the juvenile under the "care" of the Division, N.J.S.A. 2A:4-61(e), the only practical alternative. This does not give the Division the absolute right to specify the place of treatment, but only to have its recommendation as to placement considered by the court.
The statute, N.J.S.A. 2A:4-61(e), in setting out referral to the care of the Division as an alternative, specifies "care" in N.J.S.A. 30:4C-2(c) as "cognizance of a child for the purpose of providing necessary welfare services, or maintenance, or both." The two must be read in pari materia.
The broad spectrum of dispositional alternatives available to the court under N.J.S.A. 2A:4-61, when combined with the court's parens patriae duty to assure effective treatment, mandate a conclusion that it is the court itself which must be the final arbiter of just what welfare services and/or maintenance are "necessary" under N.J.S.A. 30:4C-2(c). This being so, if the court deems it necessary for the Division to provide "maintenance" for a juvenile, that agency is statutorily bound to assist the court in the performance of its duty by providing "moneys * * * to procure board, lodging, clothing, medical, dental and hospital care, or any other similar or specialized commodity or service," N.J.S.A. 30:4C-2(f). The Division cannot overrule the court's determination of how such services and maintenance are to be provided.
The court has broad power to compel governmental agencies to allocate funds so as to enforce constitutional rights, Griffin v. School Board of Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 *393 (1964). Most recently, in Robinson v. Cahill, 62 N.J. 473 (1973), our Supreme Court ordered the State to provide "equal educational opportunity" for its children to the extent of even redistributing state and local funds. If a constitutional right to effective treatment exists, as the court has determined it does, this necessarily implies the power, and in fact the duty, of the court to mandate the expenditure of funds by the Division to provide this treatment.
An important consideration in determining a specific treatment plan is the weight which the court will give to the expertise of a state administrative agency such as the Division. It is only in the experience and abilities of the persons employed that we find the elusive expertise. This court cannot decide in favor of a recommendation of the Division merely because it is the state agency charged with the responsibility to provide residential care for children; to do so would be to ignore the expertise of many other qualified persons.
While not underestimating the value of the Division's recommendations as to placement, the court would be abdicating its parens patriae duty were it not to consider the evaluations of other experts closer to and more familiar with the needs and problems of the juvenile. As a finder of fact the court must consider the testimony of all witnesses brought before it. It would be a dereliction of the court's duty to make a disposition without careful consideration of the expert testimony of Dr. Byerly, who has treated D.F. regularly for two years. Likewise, the juvenile's enrollment in the Haddonfield public school system since the primary grades serves to underscore the value of the evaluation of Dr. Messick and the child study team. Beyond this, there is the expertise of the court itself, a court set up specifically to handle matters in a way that a court of general jurisdiction could not.
The testimony of Mrs. Sebastian, so instrumental to the court's determination, exemplifies the collective knowledge and experience of the family intake unit, an indispensable *394 arm of the court, which gives it a claim to expertise equal to that of the Division.
Furthermore, expertise does not imply infallibility. The facts of this case underscore the need for prompt post-dispositional review. A party dissatisfied with the court's placement can move for a modification under R. 3:21-10, as applicable by R. 5:6-1. An order resting absolute discretion in a caseworker is, practically speaking, unreviewable. There is nothing in N.J.S.A. 30:4C-2(a) to suggest that "care" includes a duty to place a juvenile promptly. This being so, a delay in placement is neither a final order appealable under R. 2:2-3 nor a failure to perform a duty cognizable in an action in lieu of prerogative writ, R. 4:69. Perhaps the most frustrating experience in Juvenile Court is to watch a child deteriorate or become unworkable while the implementation of a treatment plan is delayed for months by the slowness of the administrative process. The effectiveness of any plan is directly related to the speed with which it is accomplished.
Other jurisdictions which have faced this question have concluded that the power to make a final determination must rest with the courts.
In In re M, 76 Misc.2d 781, 351 N.Y.S.2d 601 (1974), a New York Family Court, recognizing "the overall need of the Court to control the various service agencies upon which it must rely," 76 Misc.2d at 784, 351 N.Y.S.2d at 606, ordered the County Commissioner of Social Services to place a delinquent juvenile in a specific foster home. It interpreted the Family Court Act "to enable the Court to cut through the bureaucracy, fragmentation and lack of coordination which so inhibits the provision of services for families and children before the Court." 76 Misc. 2d at 785, 351 N.Y.S.2d at 606. It recognized that such an order may disrupt established agency procedures. The court pointed out, however, that agency decisionmakers "may not hide behind a shield of insufficient time, inadequate staff, insufficient *395 funds, or mere rhetoric." 76 Misc.2d at 787, 351 N.Y.S.2d at 608.
In an earlier case by the same name, In re M., 75 Misc.2d 672, 347 N.Y.S.2d 866 (Fam. Ct. 1973), the court, relying upon the same statute, ordered a school superintendent to place a child in a particular school.
In Gault v. Board of Directors, 103 Ariz. 397, 422 P.2d 844 (1968), the Arizona Supreme Court overturned a commitment apparently made in derogation of the court-ordered placement.
The issue of the court's power to implement the juvenile's right to treatment was faced in another context by the Minnesota Supreme Court in Welfare of J.E.C. v. State, 225 N.W.2d 245 (1975). In that case the court vacated an order of a juvenile court. The order transferred jurisdiction over a hard-core juvenile offender to the adult court, solely on the ground that adequate treatment facilities did not exist. In remanding the case the court took the position that the lack of existing facilities was not an adequate basis upon which to base a finding that the juvenile was not amenable to treatment.
On remand the juvenile court held that the "judicial branch of government * * * may require the executive branch to carry out the needs of the judicial system, and to fulfill its statutory duties." In re Welfare of J.E.C., Case No. 75604 (Hennepin Cty., Minn. D. Ct., Juv. Div., 1975), reported in 6 Juv. Ct. Dig. 459 (1975). The court referred the juvenile for further evaluation, and ordered the Commissioner of Corrections to implement a treatment program, set out in the opinion, if the juvenile was found amenable.
Due to the relatively recent judicial recognition of the court's responsibilty to assure effective treatment, there is a relative paucity of published precedent. However, several unreported cases treated at length in the Howard Law Journal & Juvenile Court Digest deserve comment, not so much as authority but as evidence of increasing judicial consciousness of this duty.
*396 In In re Savoy, No. 70-4808 (1970), the District of Columbia Juvenile Court compelled the expenditure of funds for a new facility to replace the District of Columbia Receiving Home for Children and ordered that certain interim improvements be made. Note, "Do Juvenile Courts Have a Duty to Supervise Child Care Agencies and Juvenile Detention Facilities?" 17 Howard L.J. 443 (1972). The decision is particularly relevant since it has been recognized that the statute upon which the court relied was simply a restatement of the parens patriae doctrine. Creek v. Stone, 126 U.S. App. D.C. 329, 379 F.2d 106 (D.C. Cir.1967). The court in Savoy recognized that "the responsibility for determining whether an acceptable home substitute has been provided is imposed * * * upon the Juvenile Court. * * * The Court is precluded from simply deferring to administrative or budgetary decisions [in] considering them to be the measure of what is possible. To do so would be to surrender the Court's responsibility to others." 17 Howard L.J. at 450.
On two separate occasions the Allegheny County (Pennsylvania) Court of Common Pleas, Family Division, Juvenile Section, has upheld the court's right to specify treatment. In Janet C. v. Carros, No. 1097-73, reported in 6 Juv. Ct. Dig. 139 (1974), the court, recognizing the rigidity of the staff channels, lack of communication between staff members, the red tape and inconsistencies in treatment, held the county welfare director in contempt for failing to carry out its placement order.
In In re Joyce Z., No. 2035-57, reported in 7 Juv. Ct. Dig. 14 (1975), the court placed a severely retarded young girl in an appropriate foster home despite the fact that the cost of doing so was beyond the usual amount allocated by the county for foster care. It was held that the juvenile had a statutory and constitutional right to that treatment best suited to her needs. It was recognized that "juvenile courts have a tradition of acting in loca parentis and [that] they are particularly suited to order relief which is treatment-oriented." 7 Juv. Ct. Dig. at 15.
*397 The power of the Juvenile Court to place D.F. in a specific residential facility is firmly rooted in the common law, the State and Federal Constitutions and in the statutory authority (N.J.S.A. 2A:4-61). The court's powers must be construed in such a manner as to give the court the ability to faithfully carry out its mandate that "when [a] child is removed from his own family, to secure for him custody, care and discipline as nearly as possible equivalent to that which should have been given by his parents." N.J.S.A. 2A:4-2.
The court will order that the juvenile D.F. be placed immediately in The Institute of Pennsylvania Hospital, with the financial costs to be borne by the Division. These costs may be supplemented by funds from any other source, but the primary financial obligation will remain with the State.
This court will assist the Division to apply for special funding from any other source, including the private Turrell Fund. If necessary, supplemental hearings can be held involving the financial responsibility of the school district. However, under no circumstances can there be any further delay.
The court will sign an appropriate order for an immediate placement.