649 F.2d 134
 Maria DOE and Cruz Doe, individually and on behalf of their
minor son Manuel Doe, Plaintiffs,
and
Anna Doe, Plaintiff-Appellant,
v.
NEW YORK CITY DEPARTMENT OF SOCIAL SERVICES et al., Defendants,
and
Catholic Home Bureau, Defendant-Appellee.
 No. 464, Docket 80-7531.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 4, 1980.
Decided May 13, 1981.
 
 1
 Carolyn A. Kubitschek, New York City, Michael D. Kaufman, Louise Gruner Gans, Edward Simon, Catherine P. Mitchell, New York City, for plaintiff-appellant.
 
 
 2
 Frederick J. Magovern, New York City, Peter B. Skelos, New York City, for defendant-appellee.
 
 
 3
 Before OAKES and MESKILL, Circuit Judges, and CARTER, District Judge.*
 
 ROBERT L. CARTER, District Judge:
 
 4
 Appellant Anna Doe brought this action pursuant to 42 U.S.C. § 1983 seeking redress for the violation under color of state law of her First, Fourth, Fifth, Ninth and Fourteenth Amendment rights. The source of her complaint was the various forms of child abuse, allegedly by rape, severe beating, and forcible withdrawal from school, inflicted on her by her foster father in the foster home in which she was placed. She seeks monetary damages from the Catholic Home Bureau, the agency which placed her in the home and was charged with the duty of supervising her foster care. She alleges that the agency's failure to supervise her placement adequately and to report her situation to the New York City Department of Social Services as a suspected case of child abuse led to the continuation of her mistreatment in the home.
 
 
 5
 After trial by jury, verdict was entered in favor of defendant on the issue of liability. Plaintiff now appeals, alleging error in the court's jury charge detailing the elements of liability under § 1983, and in several of its evidentiary rulings. The latter includes admitting into evidence testimony that plaintiff had recently had an out-of-wedlock child and refusing to give plaintiff's requested instruction that inferences about plaintiff's sexual conduct should not be taken as bearing on her credibility. Plaintiff also claims error in the exclusion of testimony pertaining to abuse suffered by her foster sister under circumstances similar to those of plaintiff and the exclusion of portions of a memorandum from the Assistant Commissioner of Social Services, reminding defendant to report all cases raising any suspicion of child abuse.
 
 Background Facts
 
 6
 There is substantial agreement as to most of the underlying facts of the case. Anna was born in April, 1961 and, when she was two years old, was placed in foster care along with her sister Evelyn, in the legal custody of the New York City Commissioner of Welfare. The Commissioner arranged for appellee Catholic Home Bureau to supervise the care of Anna and her sister, beginning January 5, 1964, and pursuant to this duty, the Bureau placed both girls in the home of Frank and Josephine Senerchia, whom it had investigated and certified on September 30, 1963. In 1965, the Bureau placed two additional girls, Lynn and Annette Wong in the Senerchia home.
 
 
 7
 The Bureau's duties did not end with placement, however. As a placement agency, it was charged by state law with the task of periodically inspecting and annually recertifying the Senerchia home. (New York Social Services Law §§ 376, 378) (McKinney). Its alleged failure to perform this duty is the gravamen of plaintiff's complaint.
 
 
 8
 It is uncontested that Anna remained in the Senerchia home for more than thirteen years and that initially the family environment appeared to be a promising one. The Senerchias had come well recommended by the parish priest, physician, neighbors, friends and Frank Senerchia's employer. As part of its investigation and decision to certify the home, the Bureau prepared a report which described Senerchia, a New York City policeman, as "a pleasant man, quite ordinary in achievements, (but) reliable, helpful and endowed with Christian Charity," and as someone "genuinely fond of children and (having) a genuine paternalistic interest in them." Frank Senerchia expressed the view that corporal punishment was sometimes good for children, but did not believe that spanking "should be the one and only course for parents."
 
 
 9
 In spite of this hopeful beginning, the record discloses a pattern of persistent cruelty to Anna at the hands of her foster father. Anna and her foster sisters testified that starting when she was about ten years of age, she was regularly and frequently beaten and sexually abused by Senerchia. Plaintiff testified that he beat her with his hands and belt all over her body, threw her down the stairs, and on one occasion lacerated her with a hunting knife, that he confined her to her room for days at a time, and ultimately forced her to have intercourse and oral sexual relations with him.
 
 
 10
 Plaintiff further testified that her father threatened to institutionalize her if she ever told anyone what he was doing and that when a priest, whom her foster sister Lynn had contacted, attempted to discuss allegations of child abuse with Senerchia, Lynn was severely beaten for contacting the priest. Family members were afraid of Senerchia and did not directly inform the Catholic Home Bureau of the abuses until August, 1977, when Josephine Senerchia, having been told that her husband was planning to seek a divorce, advised agency workers that she had found Anna and Senerchia in bed together. All foster children were removed from the Senerchia home shortly thereafter.
 
 
 11
 From 1964 through July, 1977, the Bureau had annually evaluated and approved the Senerchia household as a foster home for Anna. Notwithstanding this supervision, the Bureau never became aware of the extent of Anna's abuse until August, 1977, after six years of it had elapsed. Plaintiff contends that the agency's failure to discover the abuse to which she had been subjected for some six years before defendant acknowledged that something was wrong was due, at least in part, to its failure to make a thorough periodic investigation of her circumstances and to comply with its statutory duties.
 
 
 12
 Plaintiff maintains that as she grew older, visits to the home by the agency's case workers declined in frequency, so that between 1968 and 1972, for example, there were periods, once two and a half years and once fourteen months, when no one from the agency visited the Senerchia home, whereas the previous and usual pattern had been four or five home visits a year. Defendant maintains that additional contacts outside the home compensated for any shortage of visits. It is uncontested, however, that when agency workers did visit the home, discussions were almost invariably conducted in the presence of Senerchia. Plaintiff contends that this inhibited discussion of her relations with her foster father since heeding his repeated threats to have her institutionalized, she made no mention of being mistreated.
 
 
 13
 Although one case worker had expressed suspicion in 1967 that Senerchia might have "severe emotional problems," most Bureau personnel continued to give the home a favorable rating in spite of nagging suspicions that the father was excessively involved with intimate details of the girls' personal hygiene, and after 1973 had become increasingly resistant to the agency's supervision. A 1976 report found him to be "resistive to intervention by agency workers (and) difficult to schedule appointments with."
 
 
 14
 The agency's 1975 annual reauthorization report to the City of New York Human Resources Administration described efforts to see Anna alone as having "proved futile due to the foster family's attitude towards the agency."
 
 
 15
 In early January, 1975, the Bureau received its first clear tangible evidence of things going awry with Anna when she was removed from school by her father without the agency's knowledge or consent.
 
 
 16
 On January 7, the agency, after discovering that Anna had been removed from school, questioned Senerchia and was told that Anna had been engaged extensively in group sex with the other children at school, that this had gone on since the first grade, and had included full sexual intercourse, even between first-graders. The children's sexual congress, they were told, took place in empty classrooms, hallways and cafeteria, and occurred four or five times a day. Senerchia claimed that Anna had told him she would be forced to resume sexual activities when she returned to school, and for that reason he was enrolling Anna in a parochial school.
 
 
 17
 Three days later agency workers met with Anna. It is conceded that Anna, claiming that her father had told her never to talk about such matters with anyone, repeatedly refused to discuss the incident with them. Top agency personnel decided that Anna should be seen by the agency psychologist, Dr. Selma Lewis. Dr. Lewis accepted as true the allegations of Anna's sexual behavior with classmates, characterized Senerchia as a warm and sympathetic foster father, and concluded that Anna was "secure in the protectiveness and caring of her foster parents." However, agency records show that the scope of her investigation was limited. She had not read the background report on Senerchia, and neither she nor other agency personnel contacted school authorities until the truant officer was interviewed in mid-April.
 
 
 18
 Anna remained out of school throughout January and continuing through June, 1975. She met for a second time with Dr. Lewis on January 24, 1975, to assess her learning skills and determine appropriate school placement. On February 18, 1975, at a conference with Senerchia and Anna, the agency informed them that to get a special class placement Anna would need to see a psychiatrist and for this purpose an appointment was made with Dr. Lois Bellinger deAlvarado. It was also decided that the foster parents should be seen by a psychiatrist as well, but this decision was never implemented. On March 19, Anna met with Dr. deAlvarado, an expert in child abuse, who based on Anna's responses and the other information she had received, concluded that Anna was sexually involved with her foster father and should be immediately removed from the foster home. That same day Dr. deAlvarado met with agency officials and "related that she felt the foster father was sexually involved" with Anna, and she should be immediately removed from the home through legal action if necessary. Dr. deAlvarado testified at the trial that Anna did not admit to having sexual relations with her father but became unresponsive and began crying when the question was asked.
 
 
 19
 The Bureau responded by holding an administrative review on April 10, 1975. Present were agency administrative personnel and the case worker. It was decided that Senerchia's "involvement with Anna should be further investigated." However, no action appears to have been taken other than to have Dr. deAlvarado revise her report, deleting the references to sexual involvement with Senerchia. On April 14, 1975, the case worker spoke to the truant officer, who said he thought the stories of orgies in Anna's former school were unfounded. On April 16, 1975, the principal of the school informed the caseworker that he had checked the records and found that Anna had not missed any of her classes prior to being removed from school. That day the worker called Senerchia to discuss this new information, but he said he was ill, and the meeting was put off. He was not seen until May 12, 1975, when the Bureau conducted its first home visit since December, 1974. On that visit Senerchia related to the social worker a version of Anna's sexual activity that varied greatly from what the Bureau had been told previously. Although with this additional information the agency may have had growing reason to doubt the veracity of Senerchia's original charges, it chose not to follow or act upon Dr. deAlvarado's professional recommendation. It continued to allow Anna to remain in the foster home and neglected to file a report of suspected child abuse with the Department of Social Services as was required by state law.
 
 
 20
 On May 17, 1975, the Board of Education had Anna evaluated by one of its psychiatrists. The agency sent the Board a copy of Dr. deAlvarado's edited report from which all references to suspected sexual abuse had been deleted. No information was supplied about Senerchia or his problems, and the psychiatrist was not asked to, and did not investigate the possibility of Anna's sexual abuse.
 
 
 21
 In June, 1975, the agency submitted its annual report to the Department of Social Services. Neither in this report nor at other times thereafter did the Bureau inform the Department of Anna's six month absence from school, her supposed sexual proclivities, the problems in the foster home or Dr. deAlvarado's report and recommendations, although defendant's supervisory personnel admit that it was mandated that such information be shared with the Department.
 
 
 22
 After May, 1975, home visits occurred more regularly, but by February, 1976, the Senerchias were again resisting this regularized supervision. Later in 1976, an incident occurred concerning sexual activities of Anna's foster sister Lynn, that bore resemblance to the previous incident involving Anna.
 
 
 23
 On February 10, 1977, an agency supervisor sent a memorandum to Anna's current caseworker stating that a confrontation with the Senerchias could no longer be put off. As had been recommended by Dr. deAlvarado two years earlier, a psychiatric interview with Dr. Emil Piana, the agency's head psychiatrist, and the Senerchias was scheduled. The interview with Dr. Piana did not occur until a month later and did not encompass inquiries to ascertain whether Senerchia was involved sexually with Anna.
 
 
 24
 In July of 1977, Senerchia told the agency that he was planning to divorce his wife to marry his pregnant seventeen year old girlfriend. This news concerned agency personnel but nothing was done until a month later when Josephine Senerchia, on learning of her husband's plans for divorce, made her disclosure to Bureau officials.
 
 Proceedings in the District Court
 
 25
 Appellant filed suit[1] on April 11, 1979, and trial was noticed for May 12, 1980. A major pretrial substantive issue was the propriety of the court's barring discovery concerning the policies, procedures, practices and customs of the defendant with respect to incidents of child abuse in foster homes, selection and recertification of foster parents, supervision of foster homes and the actions defendant regularly took to protect foster children from maltreatment. At a conference on April 24, 1980, the court ruled that the agency's employees did not have to answer questions about agency procedures and policies. On May 1, 1980, plaintiff moved to lift the discovery restrictions on the policy and practice issue and for a postponement of trial to permit time to adduce the previously prohibited discovery. The court denied the motion in all respects. On May 13, 1980, plaintiff filed a petition for a writ of mandamus in this court asserting that the limitations on discovery and the procedure utilized by the court constituted a usurpation of judicial authority in contravention of the Federal Rules of Civil Procedure. The petition was denied the following day.
 
 
 26
 The case then proceeded to trial before a jury on May 19, 1980, and concluded eight days thereafter when the jury returned a verdict in favor of defendant. At trial plaintiff had sought to present the deposition[2] of Stella Rose Gambino, Director of Social Work for the agency. The court refused to admit those portions of the deposition into evidence which concerned allegations by the foster father in the fall of 1976 of the sexual promiscuity of appellant's foster sister.
 
 
 27
 Plaintiff also attempted to introduce into evidence a memorandum from Carol Parry, Assistant Commissioner of the Department of Social Services for Special Services for Children directed to Voluntary Child Care Agencies concerning their duty to report to the Department all suspected cases of abuse. The district court admitted only that portion of the memorandum which cited the New York Social Services Law and excluded those segments of the document which on the basis of recent observations asserted that agencies were not meeting their reporting responsibility and stressed the importance of reporting every case.
 
 
 28
 At the conclusion of plaintiff's case the court dismissed the claim of a second plaintiff, Manuel Doe, but allowed appellant's case to go to the jury. After the court charged the jury, appellant objected to that portion of the court's charge which revealed that she had conceived a child out-of-wedlock, and she requested that the jury be instructed that this fact had no bearing on the issue of credibility. She also objected to the court's instruction that the jury must find that defendant actually intended to harm the plaintiff or have had actual knowledge of the harm being inflicted on her, before it could properly hold the Bureau liable.
 
 
 29
 The court refused to alter its instructions and appellant claims error. We now reverse.
 
 Determination
 
 30
 * Requirements for § 1983 liability
 
 
 31
 Government officials may be held liable under § 1983 for a failure to do what is required as well as for overt activity which is unlawful and harmful. Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); Martinez v. Mancusi, 443 F.2d 921 (2d Cir. 1970), cert. denied, 401 U.S. 983, 91 S.Ct. 1202, 28 L.Ed.2d 335 (1971); Holmes v. Goldin, 615 F.2d 83 (2d Cir. 1980); Duchesne v. Sugarman, 566 F.2d 817, 822 (2d Cir. 1977) ("where conduct of the supervisory authority is directly related to a denial of a constitutional right, it is not to be distinguished as a matter of causation, upon whether it was action or inaction"). When individuals are placed in custody or under the care of the government, their governmental custodians are sometimes charged with affirmative duties, the nonfeasance of which may violate the constitution. Thus, non-performance of such custodial duties has been held to give rise to § 1983 cause of action for prisoners. Estelle v. Gamble, supra.
 
 
 32
 When an official is charged with default in exercise of the above affirmative responsibility, there are two fundamental requisites for § 1983 liability to be imposed. The first is that the omissions must have been a substantial factor leading to the denial of a constitutionally protected liberty or property interest. Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 461 (1976). The second is that the officials in charge of the agency being sued must have displayed a mental state of "deliberate indifference" in order to "meaningfully be termed culpable" under § 1983. Turpin v. Mailet, 579 F.2d 152, 166 (2d Cir.) (Turpin I), vacated sub nom. West Haven v. Turpin, 439 U.S. 974, 99 S.Ct. 554, 58 L.Ed.2d 645 (1978), on remand Turpin v. Mailet, 591 F.2d 426 (2d Cir. 1979) (Turpin II); Turpin v. Mailet, 619 F.2d 196 (2d Cir.) (Turpin III), cert. denied, sub nom. Turpin v. West Haven, -- U.S. --, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980).
 
 
 33
 Although inaction can be a basis for liability under § 1983, we find that the court adequately conveyed this idea to the jury in the portion of its charge which read:
 
 
 34
 As I've told you during the trial, this is a federal case, in which plaintiff must prove that her constitutional rights were violated by the Bureau. That requires the plaintiff to prove that the defendant knowingly and intentionally harmed the plaintiff, or deliberately, with knowledge that she was being mistreated in the foster home, intentionally permitted this to occur or were (sic) intentionally indifferent to whether it was occurring.
 
 
 35
 Appellant's stronger claim concerns the court's explanation of the mental state of "deliberate indifference" necessary for a finding of liability.
 
 
 36
 In applying the standard of deliberate indifference to agency supervision of a foster home, the district court faced an unusually troublesome task. The yardstick has hitherto been applied to the supervision of wardens, police chiefs and hospital administrators over subordinate officials within their institutions. See e. g., Martarella v. Kelley, 349 F.Supp. 575 (S.D.N.Y.1972) (Lasker, J.), modified in 359 F.Supp. 478 (1973); N. Y. S. Assn. for Retarded Children, Inc. v. Rockefeller, 357 F.Supp. 752 (E.D.N.Y.1973); Williams v. Vincent, 508 F.2d 541 (2d Cir. 1974); Turpin v. Mailet, 579 F.2d 152 (2d Cir. 1978); Turpin v. Mailet, 619 F.2d 196 (2d Cir. 1980); Wright v. McMann, 460 F.2d 126 (2d Cir.), cert. denied, 409 U.S. 885, 93 S.Ct. 115, 34 L.Ed.2d 141 (1972); United States ex rel. Larkins v. Oswald, 510 F.2d 583 (2d Cir. 1975). However, the relationship of a foster care agency to the families it licenses differs in two fundamental respects from supervisory situations in the cases cited above.
 
 
 37
 There is a closer and firmer line of authority running from superiors and subordinates within an institution than exists in the foster care context, particularly in respect of the relationship between agency personnel and the foster parent. Institutional administrators can readily call in subordinates for consultation. They can give strict orders with reasonable assurance that their mandates will be followed, and as added insurance other employees stationed in proximity of the subordinates to whom orders are directed may be instructed to monitor compliance.
 
 
 38
 By contrast, the Catholic Home Bureau had to rely upon occasional visits for its information gathering, and its relationship to the foster family was less unequivocally hierarchical than is the case with prison guards and a warden. There is evidence that the foster father made information-gathering difficult for the agency, and its officials were at a loss over how to deal with him.
 
 
 39
 In part this was because the agency felt constrained to respect the foster family's autonomy and integrity and pressured to minimize intrusiveness, given its goal of approximating a normal family environment for foster children.
 
 
 40
 These differences suggest that deliberate indifference ought not to be inferred from a failure to act as readily as might be done in the prison context, since in the foster care situation, there are obvious alternative explanations for a family being given the benefit of the doubt and the agency refusing to intervene. Among these in this case were, by all appearances, Anna Doe's satisfactory adjustment in her foster home and her desire to be adopted by the Senerchias.
 
 
 41
 However, the defendant at trial failed to give sufficient focus to such alternative motivation for inaction. The court, therefore, faced a dilemma. It could instruct the jury as to the normal reasoning processes by which indifference is inferred from inaction in other contexts and face the risk that the jury would draw such inferences more automatically than was appropriate. On the other hand, the court could stress the distinction between a failure to act and a deliberate lack of concern, by emphasizing that the latter is a state of mind distinct from the mere fact of negligence or sustained inaction. The court chose the second course but, in the process, conveyed an impression of deliberate indifference requiring a higher degree of knowledge, ill-will and culpability than is actually the case. It failed to explain to the jury that repeated acts of negligence could be evidence of indifference and presented a distorted conception of the term with regard to the relationship between negligence and deliberate indifference.
 
 The court charged the jury that:
 
 42
 In a federal court case, negligent care or negligent oversight by a child care agency or foster parents does not prove a claim for deliberate mistreatment, does not prove a constitutional claim. Negligence or carelessness or unintentional fault do not constitute violation of a constitutional right. If that occurred, the defendant is entitled to your verdict.
 
 
 43
 After the charge was read, the jury passed a note to the judge asking, "As a legal question, is not investigating a situation thoroughly a denial of one's constitutional rights?" This question was answered by repeating substantially verbatim the above portion of the charge.
 
 
 44
 The court's charge and response to the jury were correct insofar as they stated that ordinary negligence by itself could not establish a cause of action under § 1983.[3] New York Assn. for Retard. Children, Inc. v. Rockefeller, 357 F.Supp. 752, 765 (E.D.N.Y., 1973); Corby v. Conboy, 457 F.2d 251 (2d Cir. 1972); Holmes v. Goldin, 615 F.2d 83, 85 (1980); Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973). However, in twice saying that if negligence occurred, defendant was entitled to the jury's verdict and in seeming to equate violation of a constitutional right with "deliberate mistreatment," the court erroneously conveyed the impression that deliberate indifference and negligence were mutually exclusive.
 
 
 45
 On repeated occasions this court has drawn attention to the close affinity of the concepts, gross negligence and deliberate indifference. While the two have occasionally been equated in dicta, see Owens v. Haas, 601 F.2d 1242, 1246, 1247 (2d Cir.), cert. denied, sub nom. County of Nassau v. Owens, 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979); Turpin v. Mailet, supra, 619 F.2d at 202 (Turpin III), they are not literally coextensive. One is a type of conduct, and the other a state of mind. Nevertheless, the two are closely associated,[4] such that gross negligent conduct creates a strong presumption of deliberate indifference. Owens v. Haas, supra; Turpin III, supra, 619 F.2d at 202. While this presumption is at least theoretically rebuttable, the fact that there can be instances where glaring negligence may not constitute deliberate indifference does not mean that a fact finder is barred from equating negligence of a certain dimension with deliberate indifference. In other contexts where a fiduciary duty is imposed, evidence of grossly negligent conduct establishes the mental state requisite for imposition of liability. Cf. Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 44-47 (2d Cir. 1978) (where fiduciary duty owed to a defrauded party, recklessness satisfies the scienter requirement of § 10(b) and Rule 10b-5 of the Securities and Exchange Act), cert. denied, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1979), after remand, 637 F.2d 77 (2d Cir. 1980).
 
 
 46
 The distinction between gross negligence and ordinary negligence is neither so marked nor so obvious in practice that a jury instructed only that negligence did not state a cause of action could be expected to surmise for itself that gross negligence would. Cf. Ferrara v. Sheraton McAlpin Corporation, 311 F.2d 294 (2d Cir. 1962) (failure to instruct jury regarding meaning of a term of art is grounds for reversal when term constitutes an essential element of the case). The court should have instructed the jury as to the occasionally subtle yet pivotal distinction between ordinary negligence and grossly negligent or reckless conduct, informing them that only the latter types of behavior could support plaintiff's claims.[5]
 
 
 47
 Similarly, the court erred in charging the jury that, "the plaintiff must prove that the defendant intended the actions or failures to act of the Senerchias, and did so deliberately and voluntarily, and that this proximately caused the mistreatments complained of." The distinction between wantonness or indifference on the one hand, and ill-will or the affirmative acquiescence in mistreatment on the other is well established.[6] In cases dealing with police brutality, a mere lack of responsiveness to citizen complaints sometimes has been held insufficient to establish a causal link between supervisory inaction and subsequent instances of brutality. Turpin III, supra, at 203-04; Rizzo v. Goode, supra. The liability of the police department itself has depended upon a showing of condonation or tacit encouragement of misconduct. Defendant argues that this standard should be applied here as well. However, in this case the causal link between the agency's alleged failure to supervise and the continuation of Anna's abuse is clear. If the agency had investigated Anna's case with sufficient acuity and diligence to discover the abuse, it would have been able to prevent further abuse by withdrawing her from the home. Cf. Smith v. Ambrogio, 456 F.Supp. 1130, 1136 (D.Conn.1978) (Newman, J.) (distinguishing between cases where action is claimed to be required to remedy a specific situation and cases where action is claimed to be required to prevent the next in a series of isolated episodes). The key question is whether the state of mind was such that the agency may be "meaningfully termed 'culpable,' " Turpin I, supra, 579 F.2d at 166, and for this requirement, "deliberate indifference" rather than intentional harm is the appropriate yardstick.
 
 
 48
 The district court instructed the jury that to establish liability plaintiff would have to show that the agency had specific knowledge of Anna's mistreatment in the foster home.[7] Stated most generally, the requirement of deliberate indifference is that the defendant be "deliberately indifferent to plaintiff's welfare." Holmes v. Goldin, supra, 615 F.2d at 85. Of course, such indifference cannot exist absent some knowledge triggering an affirmative duty to act on plaintiff's behalf, but actual knowledge of a specific harm is not the only type of knowledge that will suffice. Defendants may be held liable under § 1983 if they, or in the case of an agency, its top supervisory personnel, exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution. In Owens v. Haas, supra, 601 F.2d at 1246 the circuit stated that "a mere failure by the county to supervise its employees would not be sufficient to hold it liable under § 1983 (but that) the county could be held liable if failure to supervise or the lack of a proper training program was so severe as to reach the level of 'gross negligence' or 'deliberate indifference' to the deprivation of plaintiff's constitutional rights." This was so regardless of whether county officials were aware of the specific deprivations while they were being administered by subordinates.
 
 
 49
 In other cases, defendants have been "charged with knowledge" of unconstitutional conditions when they persistently violated a statutory duty to inquire about such conditions and to be responsible for them. Wright v. McMann, 460 F.2d 126 (2d Cir. 1972); United States ex rel. Larkins v. Oswald, 510 F.2d 583 (2d Cir. 1975).
 
 
 50
 These cases are best understood not as imposing strict liability under § 1983 for failure to perform statutory duties, but as inferring deliberate unconcern for plaintiffs' welfare from a pattern of omissions revealing deliberate inattention to specific duties imposed for the purpose of safeguarding plaintiffs from abuse. See Duchesne v. Sugarman, 566 F.2d 817, 832 n.31 (2d Cir. 1977).
 
 
 51
 For these reasons it is far from irrelevant that New York Social Services Law § 413 (McKinney) imposed a strict duty on the agency to report all suspected cases of child abuse to the Department of Social Services.[8] The district court's instruction implying lack of relevance was error.[9] The more a statute or regulation clearly mandates a specific course of conduct, the more it furnishes a plausible basis for inferring deliberate indifference from a failure to act, even without any specific knowledge of harm or risk. This is because failure to undertake a specific course of action in vindication of a general duty can reasonably be attributed to a bona fide difference of opinion as to how the duty should be performed. However, no such alternative explanation for nonfeasance can be raised where the task mandated is specific and unequivocal. The duties imposed by § 413 of the Social Services Law were of the latter character, particularly in conjunction with Commissioner Parry's memorandum stressing the importance of strict compliance.[10]
 
 
 52
 The duty imposed by § 413 was relevant to two separate theories of liability neither of which was adequately detailed in the plaintiff's request to charge.[11] By one theory the failure to report was itself a proximate cause of Anna's continuing injury and could be the basis for liability if the agency's failure was the result of its being deliberately unconcerned about whether it complied with that duty, since reporting would have led to an investigation by the Department's confidential investigations unit which might well have discovered the abuse and put an end to it in March, 1975.
 
 
 53
 Another theory of relevance views the failure to report in the face of clear statutory instructions to do so, simply as evidence of an overall posture of deliberate indifference toward Anna's welfare. Under this theory the statute does not in and of itself furnish any basis for a finding of liability, but merely constitutes incremental documentation of a pervasive pattern of indifference.[12] In any event, the reporting duty imposed on the Bureau was highly relevant and the jury should have been so instructed.
 
 Evidentiary and Discovery Rulings
 
 54
 Prior to trial a dispute arose over whether plaintiff would be allowed discovery of the agency's policies, practices and procedures in attempting to ensure protection of foster children under its supervision. The court allowed liberal discovery of facts pertaining directly to Anna Doe's case, but denied discovery of facts relating to the cases of other children. Appellant argues that the court's ruling was prejudicial in that it foreclosed a possible avenue of recovery based on official policy of the agency. Monell v. Dept. of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); Adickes v. S. H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); Turpin III, supra. While appellant is correct in identifying official policy as a possible basis for liability, the prospect of the agency having a policy encouraging or condoning child abuse is sufficiently remote, and a truly wide-ranging discovery of agency's practices and procedures sufficiently burdensome, that it was not an abuse of discretion for the trial judge to deny discovery on this basis. The district court's discretion on questions of discovery is generally broad. Voegeli v. Lewis, 568 F.2d 89 (8th Cir. 1977).
 
 
 55
 A more compelling ground for allowing limited discovery of agency action in other cases is provided by the rationale of Bishop v. Stoneham, 508 F.2d 1224 (2d Cir. 1974), that a "series of incidents closely related in time, within several months (for example), may disclose a pattern of conduct amounting to deliberate indifference " Id. at 1226. On remand it would be appropriate for the trial court to consider whether appellant should be allowed additional discovery aimed at disclosing the circumstances of other instances of child abuse or neglect of foster children supervised by the Catholic Home Bureau occurring in recent years, confined to such time period as the trial court deems appropriate. Such information conceivably could be probative on the issues of deliberate indifference.
 
 
 56
 Similarly, the exclusion of evidence pertaining to Anna's foster sister's abuse was erroneous. The portions of Stella Rose Gambino's deposition pertinent to this incident should have been admitted into evidence, and Dr. deAlvarado should have been allowed to testify regarding that case as well as Anna's, since the foster father's actions and allegations toward the sister were relevant to the agency's notice and knowledge of risk of harm to Anna. Rule 404(b) Fed.R.Ev. (similar acts admissible to show knowledge). While the agency's failure to discover the sister's abuse would be by no means dispositive of whether the agency was deliberately indifferent in Anna's case, evidence need not be conclusive in order to be relevant. An incremental effect on the probability of a jury reasonably finding deliberate indifference is sufficient. Contemporary Mission, Inc. v. Famous Music Corporation, 557 F.2d 918, 927 (2d Cir. 1977). Also see Kerr v. City of Chicago, 424 F.2d 1134, 1138 (7th Cir.), cert. denied, sub nom. Mohan v. Kerr, 400 U.S. 833, 91 S.Ct. 66, 27 L.Ed.2d 64 (1970).
 
 
 57
 Likewise, the court should have admitted the memorandum of Assistant Commissioner Parry reminding agencies of their duty to report all suspected cases of abuse in accordance with New York Social Services Law § 413 (McKinney).[13] The fact that the agency failed to report the incident with Anna in the face of a recent reminder that reporting must be done in all cases is relevant to the issue of deliberate indifference.
 
 
 58
 While questioning the plaintiff at trial,[14] Judge Pollack elicited over plaintiff's attorney's objections the fact that Anna had recently borne an out-of-wedlock child, a fact which was reiterated in the court's charge to the jury. Defendant defends the admission of such evidence on the theory that it was relevant to the issue of damages. Presumably their theory is that Anna's having borne a child shows that her capacity to perform and enjoy sex was not greatly harmed by her abuse in the foster home. We think such a conception of relevancy to be highly attenuated and of dubious validity. At the very least, plaintiff was entitled to have the cautionary instruction to the jury that her having had an out-of-wedlock child, or for that matter, any sort of sexual conduct, should not be taken as bearing on credibility.[15] See Lucero v. Donovan, 354 F.2d 16, 22 (9th Cir. 1965); United States v. Rabinowitz, 578 F.2d 910, 912 (2d Cir. 1978); United States v. Nuccio, 373 F.2d 168, 171 (2d Cir.), cert. denied, 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 623 (1967); United States v. Provoo, 215 F.2d 531, 537 (2d Cir. 1954).
 
 
 59
 Defendant argues that any errors committed by the trial court would have been harmless because plaintiff's case was so weak that it should never have gone to the jury. We disagree. This is a complicated and difficult case. Whether the Catholic Home Bureau's omissions were the product of deliberate indifference and proximately caused any portion of Anna's abuse were questions of fact to be resolved by the jury.
 
 
 60
 Reversed and remanded for a new trial.
 
 MESKILL, Circuit Judge (dissenting):
 
 61
 Appellant's primary contention on appeal is that errors in Judge Pollack's charge to the jury require reversal. Because I am convinced that the court's charge was proper when viewed as a whole and that the remainder of plaintiff's arguments involve alleged errors by the district court that would not warrant reversal, I dissent.
 
 
 62
 The trial court allowed the case to go to the jury only under a reserved decision to grant Catholic Home Bureau's (the "Bureau") motion to dismiss. Judge Pollack told counsel that any jury "verdict for the plaintiff could be reached only through passion or prejudice and would have to be set aside as unreasonable" because "(t)his case falls hopelessly short of constituting deliberate indifference to the supervision, living conditions, welfare, treatment, or conduct of the foster parents." The court explained:
 
 
 63
 Negligent supervision is not something on which a suit can be brought in the federal courts under the Civil Rights Acts
 
 
 64
 Negligent supervision is not equated with deliberate neglect, deliberately improper or deliberately indifferent conduct, which calls for knowledge and awareness of what is going on. There is no evidence in this record whatever of knowledge by Catholic Home Bureau of a pattern of constitutionally offens(ive) acts and failure to take remedial steps. Indeed, the contrary is the evidence in this record.
 
 
 65
 The first reports and I am not speaking of abstruse, unsubstantiated speculations of abuse reached the agency on August 23, 1977, and that very day the agency galvanized into action, investigated, barred the father from the foster home and within days closed the home and removed the children elsewhere.
 
 
 66
 The courtroom proof, from every witness who testified, was that Catholic Home Bureau was lied to by Anna and her sister, was told by them that everything was all right. They never complained or revealed to anyone any impropriety of the foster father, not to the case workers, not to the foster mother, not to the school teachers, not to the priests, not to her sister who resided with her, and not to any girl or boy friend or anyone else.
 
 
 67
 The thing that stands out starkly in this record is that the plaintiff and her sister are admitted liars on whose word no one could rely and who at all events put the Catholic Home Bureau in a frame of mind other than of apprehending impropriety.
 
 
 68
 In this Court's view, no reasonable person could find, in the light of the evidence adduced at trial, that a federal cause under the Civil Rights Act was made out against the Catholic Home Bureau.
 
 
 69
 A. 403-05.
 
 
 70
 Despite the conclusion of the trial judge that plaintiff's case against the Bureau fell "hopelessly short of constituting deliberate indifference," A. 404, the majority finds this to be "a complicated and difficult case." Maj. op. at 149. With the advantage of hindsight not enjoyed by the defendant, the majority finds it difficult to understand the Bureau's failure to discover Senerchia's alleged abuse of Anna. Specifically, the majority points to a report prepared by one of the defendant's staff psychiatrists, Dr. deAlvarado, in which she stated "there is reason to be concerned as to the foster father's relationship with this girl." A. 269. Dr. deAlvarado's concern primarily was triggered by Anna's response to the doctor's inquiry as to whether she was sexually involved with her foster father. Rather than giving the expected response of "Gee, are you nuts? Are you crazy?" A. 119, Anna responded only by tearfully turning away in silence. A. 268.
 
 
 71
 There was other evidence possessed by the Bureau, however, that strongly contradicted any suspicions that could have been raised by reason of the report prepared by Dr. deAlvarado. Indeed, there were clear indications that Anna's relationship with her foster parents was supportive and that the maintenance of the relationship was necessary to her emotional well-being. For example, in an interview conducted two months prior to the one by Dr. deAlvarado, a different staff psychiatrist, Dr. Lewis, had concluded that "the foster home should be maintained, if possible, because of the warm, secure environment it offers the girls." A. 259. Dr. Lewis had further stated that Anna appeared "to be generally quite docile and secure in the protectiveness and caring of her foster parents." A. 261. Significantly, Dr. Lewis' findings were based upon the results of separate interviews with Anna and Senerchia, whereas Dr. deAlvarado had interviewed only Anna. Moreover, several months after the interview by Dr. deAlvarado, Anna was examined by a non-staff psychiatrist, Dr. Davis. This psychiatrist "saw Anna for a lengthy psychiatric evaluation" and subsequently interviewed the Senerchias. A. 399. Dr. Davis concluded that "anything which can be done to facilitate (the Senerchias' adoption of Anna) would be helpful." A. 397. Importantly, Dr. Davis' report indicated that he was aware of the suspicions that had been generated concerning Senerchia's alleged salacious activity with Anna.[1] Additionally, an experienced caseworker was assigned to Anna after Dr. deAlvarado's interview and made thirteen visits to the Senerchias within one year. The caseworker concluded, in a report prepared following those visits, that "(a)fter extensive discussions with both parents in regard to Anna's sexual behavior, I could find no evidence of any sexual involvement between Anna and Mr. S(enerchia)." A. 316. Finally, in 1977, when the Senerchias were evaluated psychiatrically prior to obtaining the final approval of their anticipated adoption of Anna, the psychiatrist reported that the Senerchias "were both in good contact with reality, polite, well controlled, friendly, conversational, and did not show evidence of emotional disturbance, or pathological symptomatology." A. 544. It is difficult to imagine how the Bureau's failure to detect Mr. Senerchia's alleged abuse of Anna could be attributed to any "deliberate indifference" or "gross negligence" of the Bureau.
 
 
 72
 The majority nevertheless argues that subtle ambiguities in the court's instructions may have misled the jury. The issue, however, is not whether the jury charge was perfect, see Franks v. United States Lines Co., 324 F.2d 126, 127 (2d Cir. 1963), but rather whether the charge, taken as a whole, is likely to mislead the jury as to the applicable principles of law. Norfleet v. Isthmian Lines, Inc., 355 F.2d 359, 362-63 (2d Cir. 1966). My reading of the charge convinces me that, taken as a whole, it adequately explained the applicable principles of law, and does not constitute grounds for reversal.
 
 
 73
 The majority concedes that the charge adequately explained that inaction can be a basis for liability under § 1983, see Estelle v. Gamble, 429 U.S. 97, 103-06, 97 S.Ct. 285, 290, 292, 50 L.Ed.2d 251 (1976). Furthermore, the majority acknowledges that the court properly rejected plaintiff's requested instruction defining "deliberate indifference" and concedes that plaintiff's requested charge respecting the requisite knowledge of the Bureau was "somewhat confusing." Nevertheless, the majority labels as error the failure of the trial judge to interject into his charge an abstruse instruction describing the relationship between gross negligence and deliberate indifference. As the majority's discussion of "intent," "knowledge," and "deliberate indifference" illustrates, however, these concepts are elusive and difficult to apply in the context of § 1983 actions. I doubt that the majority's discussion provides a clearer, more accurate application of these concepts than was contained in Judge Pollack's explanation to the jury that
 
 
 74
 (Plaintiff must) prove that the defendant knowingly and intentionally harmed the plaintiff or deliberately, with knowledge that she was being mistreated in the foster home, intentionally permitted this to occur or were (sic) intentionally indifferent to whether it was occurring
 
 
 75
 In short, the plaintiff in this type of case, in order to recover, must establish with credible evidence, believable evidence, that the defendant on trial knowingly and intentionally closed its eyes to and permitted or knowingly and intentionally caused the mistreatment which the plaintiff says violated her rights.
 
 
 76
 A. 217-18. This charge, which was adequate and clear, should have been endorsed by this Court. Instead, it has been criticized for not having explained to the jury the close relationship between the concepts of gross negligence and deliberate indifference. However, there was no evidence of gross negligence for the jury to consider. But, even more important, there is no indication that plaintiff ever requested any instruction respecting the relationship between "gross negligence" and "deliberate indifference."
 
 
 77
 The court's charge regarding the Bureau's duty to report stated correctly that the Bureau could not be held liable under § 1983 "because it did or didn't report what was going on in school or elsewhere to the Department of Social Services." A. 217. The majority argues that the district court's charge implies that a failure to report is irrelevant to establishing liability under § 1983; however, that implication only arises if the challenged portion of the charge is taken out of context. The immediately preceding sentence of the court's charge instructed the jury that intentional indifference by the Bureau concerning whether Anna was being mistreated was actionable. Since the court had admitted into evidence the statutory duty to report child abuse, A. 154-55, Appellant's br. at 37, the most reasonable interpretation of the charge, taken as a whole, was that a failure to report suspected child abuse was not itself actionable under § 1983, but was actionable to the extent that the failure to report resulted from deliberate indifference to Anna's welfare. Furthermore, the majority concedes that plaintiff's requested charge on this matter was erroneous and that plaintiff never articulated the theoretical nuances conjured up by the majority. Can this be plain error?
 
 
 78
 With respect to the court's discovery rulings, although the majority could not find any reversible error, it suggested that broader discovery may be appropriate on remand. In connection with the challenged evidentiary rulings, the majority finds that the district court erred in its balance of the probative value and prejudicial effect of the disputed evidence. These evidentiary rulings, however, lay within the broad discretion of the trial judge, see United States v. Williams, 577 F.2d 188, 191-93 (2d Cir.), cert. denied, 439 U.S. 868, 99 S.Ct. 196, 58 L.Ed.2d 179 (1978). First, the evidence respecting Anna's foster sister was not relevant to the Bureau's knowledge of Anna's problems where deliberate indifference is the standard. The admission of such evidence could only have confused the jury. Moreover, the reference in Parry's letter to the failure of unnamed agencies to report child abuse might well have led the jury to infer that the letter charged the Bureau with failing to report incidents of child abuse when there was no such evidence in the case. Finally, the majority faults the trial judge for eliciting the fact that Anna had recently borne a child out of wedlock. But Anna herself placed her sexual conduct in issue by claiming that as a result of sexual abuse in her foster home she had problems in her married sex life. I do not believe that Judge Pollack abused the discretion afforded him in making these rulings.
 
 
 79
 It is obvious that the majority does not agree with the result reached in this case. This is no excuse, however, for remanding for a new day in court when the plaintiff has already had a fair trial.
 
 
 80
 I would affirm.
 
 
 
 *
 Of the Southern District of New York, sitting by designation
 
 
 [1]
 This action was originally commenced by Maria and Cruz Doe individually and on behalf of their minor children Anna Doe and Manuel Doe, seeking damages on the basis of three distinct legal claims against the New York City Department of Social Services and its former commissioners, the Catholic Home Bureau, and other institutional and individual defendants. Plaintiffs reached a settlement on their § 1983 claims with all the defendants except the Catholic Home Bureau and its caseworkers. The claims against the latter were dismissed for failure of service of process. Manuel Doe's claim against the Catholic Home Bureau was dismissed at trial, and this dismissal is not being appealed. Plaintiffs' claim, based on the manner in which Maria and Cruz Doe were induced to surrender their children, and their claim, based on the agency's failure to provide federally mandated services, were withdrawn. Plaintiffs' pendent state claims were dismissed by the trial court on the morning of trial, and there is no appeal from that dismissal. On this appeal the sole appellant is Anna Doe, the Catholic Home Bureau is the sole appellee, and only those claims brought under § 1983 are before the court
 
 
 [2]
 Stella Rose Gambino was unavailable at trial due to pressing and unforeseen business in South America. Plaintiff sought to present portions of her deposition in lieu of her testifying
 
 
 [3]
 The Supreme Court has twice expressly left open the question of whether simple negligence will suffice to establish liability for damages under § 1983. Procunier v. Navarette, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); Baker v. McCollan, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). This circuit has tended in dicta to declare that simple negligence is insufficient, see authorities cited in text, but on at least one occasion has expressed doubt as to whether the issue is closed. Holmes v. Goldin, 615 F.2d 83, 85 (1980)
 For purposes of deciding this appeal we assume that simple negligence does not establish a cause of action under § 1983.
 
 
 [4]
 The close association is captured by a longstanding definition of "gross negligence" provided by the Massachusetts Supreme Judicial Court:
 (Gross negligence is an) indifference to present legal duty and utter forgetfulness of legal obligations, so far as other persons may be affected, (and) a manifestly smaller amount of watchfulness and circumspection than the circumstances require of a person of ordinary prudence.
 Burke v. Cook, 246 Mass. 518, 141 N.E. 585, 586 (1923). Traditionally the term "gross negligence" has been held equivalent to the words "reckless and wanton," see, e. g., Jones v. Commonwealth, 213 Ky. 356, 281 S.W. 164, 167 (1926), and the Supreme Court in Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), has characterized deliberate indifference as "the wanton infliction of unnecessary pain." Id. at 105, 97 S.Ct. at 291.
 Jones v. Commonwealth was later overruled on grounds unrelated to the definition for which it is cited. See Owens v. Commonwealth, 487 S.W.2d 897 (Ky.1972).
 
 
 [5]
 The difficulty of the district court's task was magnified by plaintiff's having requested an instruction which seemingly equated "deliberate indifference" with simple negligence. Plaintiff's requested instruction read in part:
 In order to find fault or liability on the part of the defendant Catholic Home Bureau you must find that the Catholic Home Bureau acted or failed to act with deliberate indifference. This means that before the Catholic Home Bureau can be found liable you must find that the Bureau through its employees, including supervisory employees, was aware or knew of an unreasonable, serious risk of harm to plaintiff Anna (Doe) and that the defendant Catholic Home Bureau through its employees, including supervisory employees, failed to take the steps that a reasonable person, individual or corporation, in its position would have taken to eliminate this danger, taking into consideration all of the circumstances in this case.
 Insofar as this requested instruction equated "deliberate indifference" with the "reasonable person" standard associated with simple negligence, the district court was correct in rejecting it.
 
 
 [6]
 A wanton act is "one done in reckless or callous disregard of, or indifferent to, the rights of one or more persons." 3 Devitt & Blackmar, Federal Jury Practice Instructions, § 85.11
 Defendant argues that plaintiff is precluded from raising the issue of deliberate indifference versus intentional harm by her own requested jury instruction on which the court relied. This instruction read in part:
 Plaintiff must establish that defendant 'knowingly and intentionally' did the action or omission which plaintiff asserts violated her rights. This means that plaintiff must prove that defendant intended the action or failures to act and did them deliberately and voluntarily.
 Although the requested instruction is somewhat confusing, its thrust appears to be that defendant must have intended its own failure to supervise, that is, its own omissions vis-a-vis the Senerchia foster home. The court's charge to the jury went considerably beyond this in stating that
 the plaintiff must prove that the defendant intended the actions or failures to act of the Senerchias, and did so deliberately and voluntarily, and that this proximately caused the mistreatments complained of.
 
 
 [7]
 The court's charge read in pertinent parts:
 (Plaintiff must) prove that the defendant knowingly and intentionally harmed the plaintiff or deliberately, with knowledge that she was being mistreated in the foster home, intentionally permitted this to occur or were (sic) intentionally indifferent to whether it was occurring
 In short, the plaintiff in this type of case, in order to recover, must establish with credible evidence, believable evidence, that the defendant on trial knowingly and intentionally closed its eyes to and permitted or knowingly and intentionally caused the mistreatment which the plaintiff says violated her rights
 By using the phrase "knowingly and intentionally closed its eyes to and permitted," the court implied a requirement of actual knowledge.
 
 
 [8]
 § 413 of the Social Services Law read:
 The following persons and officials are required to report or cause a report to be made in accordance with this title when they have reasonable cause to suspect that a child coming before them in their professional or official capacity is an abused or maltreated child: any physician, surgeon, medical examiner, coroner, dentist, osteopath, optometrist, chiropractor, podiatrist, resident, intern, registered nurse, hospital personnel engaged in the admission, examination, care or treatment of persons, a Christian Science practitioner, school official, social services worker, day care center worker or any other child care or foster care worker, mental health professional, peace officer or law enforcement official. Whenever such person is required to report under this title in his capacity as a member of the staff of a medical or other public or private institution, school, facility, or agency, he shall immediately notify the person in charge of such institution, school, facility, or agency, or his designated agent, who then also shall become responsible to report or cause reports to be made. However, nothing in this section or title is intended to require more than one report from any such institution, school or agency.
 The specificity of the duty under § 413 is further highlighted by § 415 which reads:
 Reports of suspected child abuse or maltreatment made pursuant to this title shall be made immediately by telephone and in writing within forty-eight hours after such oral report. Oral reports shall be made to the statewide central register of child abuse and maltreatment unless the appropriate local plan for the provision of child protective services provides that oral reports should be made to the local child protective service. In those localities in which oral reports are made initially to the local child protective service, the child protective service shall immediately make an oral or electronic report to the statewide central register. Written reports shall be made to the appropriate local child protective service in a manner prescribed and on forms supplied by the commissioner. Such reports shall include the following information: the names and addresses of the child and his parents or other person responsible for his care, if known; the child's age, sex and race; the nature and extent of the child's injuries, abuse or maltreatment, including any evidence of prior injuries, abuse or maltreatment, including any evidence of prior injuries, abuse or maltreatment to the child or his siblings; the name of the person or persons responsible for causing the injury, abuse or maltreatment, if known; family composition; the source of the report; the person making the report and where he can be reached; the actions taken by the reporting source, including the taking of photographs and x-rays, removal or keeping of the child or notifying the medical examiner or coroner; and any other information which the commissioner may, by regulation, require, or the person making the report believes might be helpful in the furtherance of the purposes of this title. Written reports from persons or officials required by this title to report shall be admissible in evidence in any proceedings relating to child abuse or maltreatment.
 
 
 [9]
 The instruction read:
 The Catholic Home Bureau is not to be held liable because it did or didn't report what was going on in school or elsewhere to the Department of Social Services. That is no part of Anna's constitutional rights. That is between the Home Bureau and the Department of Social Services. Whether they acted wisely or not and whether they had or did not have duties to the Department of Social Services is not the issue here.
 
 
 [10]
 See note 13 infra
 
 
 [11]
 Plaintiff's requested instruction merely reiterated the provisions of the Social Services Law and did not explain how those provisions were relevant to defendant's liability under § 1983. Plaintiff's requested instruction stated in part:
 Defendant Catholic Home Bureau performs an important public function when it assumes custody of children from the Commissioner of Social Services of the City of New York, and I charge you that this defendant is required to perform duties and to act with the highest degree of care.
 Insofar as this passage implied that the relevance of the Social Services Law was in its holding the Catholic Home Bureau to a standard of care stricter than the ordinary negligence standard the district court was correct in refusing to incorporate the request in its charge.
 
 
 [12]
 The same two theories of relevance apply to other statutory provisions, e. g. New York Social Services Law § 371, §§ 374-378 (McKinney), which the Catholic Home Bureau allegedly violated by neglect of duty. Similarly, the provision of the New York Family Court Act § 1012(f)(i)(A) (McKinney) which defines keeping a child out of school as child abuse, was relevant insofar as it showed that if the agency knew Anna was being kept out of school, and it chose not to intervene to correct the situation, it must presumably have known that it was acquiescing in a form of child abuse
 
 
 [13]
 The March 5, 1975 memorandum of Assistant Commissioner Parry read as follows:
 Several instances of suspected child abuse which were not reported by the agency supervising a foster home, have been brought to my attention. These instances were revealed in the course of the Independent Review (held as a result of the 10 Day Notice of Removal of a Foster Child through testimony and documentation). However, not one incident of a suspected abuse was previously reported to Central Registry, nor has any maltreatment of a child been cited as a reason for removal of a child. Other situations have been found in the routine course of investigation by the Protective/Inspection Units, whereby another child may be placed in a home being investigated, having been abused in a previous home.
 Since such Independent Reviews cover only a very small percentage of the children in foster care, the larger issue is how many foster children in care may be abused and/or maltreated (as defined in the Family Court Act and Social Services Law, Article 6, Title VI) and how many such incidents go unreported.
 According to Article 6, Title VI, covering Child Protective Services of the Social Service Law, all cases of suspected child abuse or maltreatment must be reported. Section 413 of the Social Service Law designates the persons and officials who are mandated sources and indicates that whenever such person is required to report in his capacity as a member of the staff of a medical or other public or private institution, school, facility or agency, he shall immediately notify the person in charge of his designated agency who shall then become responsible to report or cause reports to be made. In addition, any other person who has reasonable cause to suspect that a child is an abused or maltreated child may make such a report.
 The penalties for failure to report abuse or maltreatment are specifically spelled out:
 (a) Any person, official or institution mandated to report child abuse or maltreatment, who willfully fails to do so, shall be guilty of a Class A Misdemeanor.
 (b) Any person, official or institution mandated to report a case of suspected child abuse or maltreatment who knowingly and willfully fails to do so shall be civilly liable for the damage proximately caused by such failure.
 Copies of the Child Protective Procedure will be sent to you shortly.
 It is important that Social Services Law, Article 6, Title 6, be reviewed with your staff pointing up the necessity of reporting suspected cases of abuse and/or maltreatment. It is better, by far, in the best interests of the children we are mandated to protect, to err on the side of reporting cases which may be unfounded, than not to report and thereby endanger our children. It is imperative that diligent reporting be made to the SSC Central Registry, 431-4680 as well as our Protective/Inspective Units, the latter having the responsibility of investigating all allegations of this nature. In reporting all suspected instances of abuse and maltreatment, you are not only protecting the health and welfare of the children in care, but the agency as well.
 With your full cooperation I am sure our children will be receiving better services which will enhance their care.
 The District Court would have been correct in excising only the first paragraph, that is, the portion which cited unreported abuses in unnamed agencies. Given that there is no reason to believe that the Catholic Home Bureau was one of the agencies referred to, the possibly prejudicial effect of that portion of the memorandum outweighs any probative value it might have. Rule 403, Fed.R. of Ev. However, the remainder of the memorandum, and particularly the last full paragraph which stressed the importance of reporting all uncertain cases, should have been admitted into evidence.
 
 
 [14]
 During the direct testimony of plaintiff the trial judge three times interrupted and conducted what amounted to a lengthy cross-examination of the witness, totaling 36 pages of trial transcript. Although the questioning was generally pertinent and a brilliant example of the art of cross-examination, its very effectiveness could only magnify the dangers it posed. When a trial is being conducted in front of a jury, it is of the utmost importance that the court maintain an appearance of strict neutrality, United States v. Sheldon, 544 F.2d 213, 219 (5th Cir. 1976), regardless of whether the trial is civil or criminal. Anderson v. Great Lakes Dredge and Dock Co., 509 F.2d 1119, 1131 (2d Cir. 1974). The more extensively a judge questions a witness, the less likely it is that an appearance of neutrality can be maintained
 Although appellate courts are often loathe to reverse based simply on the quantity of questioning by the trial court, see United States v. Switzer, 252 F.2d 139 (2d Cir.), cert. denied, 357 U.S. 922, 78 S.Ct. 1363, 2 L.Ed.2d 1366 (1958), such questioning definitely "should not become the rule," United States v. D'Anna, 450 F.2d 1201, 1206 (2d Cir. 1971). The fact that this case must be reversed on other grounds obviates the need for us to decide whether the magnitude and pointedness of the court's questioning require reversal. We merely note in passing that such questioning should be used sparingly, and perhaps only when the attorneys have demonstrated an inability to elicit important testimony.
 
 
 [15]
 Plaintiff was likewise entitled to her requested instruction that as a child under the age of 17 she was legally incapable of consenting to sexual relations with her foster father. New York Penal Code §§ 130.25, 130.30, 130.35 (McKinney). The jury's awareness of evidence that Anna did not publicly protest the foster father's actions, together with evidence of her out-of-wedlock child may well have raised the issue of consent in the jury's mind, thus necessitating an instruction to counteract improper inferences
 
 
 [1]
 Dr. Davis' report states, "Obviously someone became suspicious of the adequacy of the home and the adoptive father's behavior." A. 396. (Emphasis supplied)