J. George Follett, J.
In this proceeding, the Law Guardian seeks an order pursuant to section 255 of the Family Court Act directing the Commissioner of Social Services of this county to render assistance and co-operation in providing suitable foster care services for children adjudicated juvenile delinquents and persons in need of supervision. The pertinent part of that statute reads as follows: "It is hereby made the duty of, and the family court or a judge thereof may order, any state, county and municipal officer and employee to render such assistance and cooperation as shall be within his legal authority, as may be required, to further the objects of this act.[1] In an earlier decision, it was held that such an order was appropriate under the circumstances of this case.[2] That decision concluded that the Commissioner of Social Services of this county must file with the court a written plan designed to meet "each and every readily foreseeable contingency involved in the placement of a juvenile delinquent or person in need of supervision in foster care, including an ongoing training program for foster parents.[3]
*365 The plan has been submitted and a hearing held at which the parties argued the adequacy of the plan. This decision examines whether or not the plan, once implemented, can be reasonably expected to produce the foster homes required by this court for juvenile delinquents and persons in need of supervision.[4]
The plan presents a strong foundation for the development of a foster care program for the court placed juvenile. The plan makes a commitment to adequate staffing of the home finding unit. This was one of the principal difficulties encountered at the time of the section 255 hearing in this proceeding. The plan notes that additional staff has been requested from, but not approved by, the St. Lawrence County Board of Legislators. This court is aware that position creation is a discretionary matter with the County Board of Legislators and that requests may be turned down even in the face of persistent urging and logical arguments. However, that need not be the end of the matter. It may be possible to shift staff from other areas within the organization. Also, additional staff positions may become available through Federally-funded manpower development programs. Less costly but well trained para-professional personnel under the supervision of an experienced caseworker in the home finding unit could substantially enlarge the capability of the unit. Furthermore, a caseworker’s time may be well spent in organizing a system of community home finding volunteers through requesting assistance from established organizations such as the foster parent organization, county extension services, church groups, women’s auxiliary organizations, fraternal and service organizations and community clubs.
The plan makes a commitment to co-operation with the Probation Service in the selection of specific homes capable of meeting the needs of specific juveniles. A high degree of cooperation is essential for successful preplacement planning and subsequent treatment. Essential to good co-operation is a clear definition and understanding of the specific functions and roles of each unit of government.
The plan makes a commitment to an in-service training program for staff development. It is presumed that such a *366 program will include a special training component for personnel of the home finding unit.
The plan also contains a commitment to an ongoing training program for foster parents. Such training is now generally accepted as an essential ingredient of any foster care program.[5] The department is to be complimented for the comprehensive foster parent training syllabus submitted with the plan.[6]
The plan contains a commitment to assist in the formation of a county chapter of the Foster Parents Organization. In fact, since the earlier decision in this case, such an organization has been formed. It seems to have stimulated great interest and support among foster parents in the county. Such organizations provide a useful function as a vehicle for training, identifying and adjusting complaints, integrating the foster care program and identifying new foster homes.
Even though the over-all program and goals described in the plan should substantially enhance the availability and quality of foster care for juveniles, there are certain deficiencies which require examination. The staff turnover problem within the home finding unit has not been addressed. This was a major problem identified at the earlier hearing in this proceeding. Certain staff members have remained in that unit for as few as four months at a time. It takes months of experience for a caseworker to become proficient in locating, approving, and preparing foster parents for the acceptance of foster children.
Since the earlier decision in this case, a capable and dedicated young man was assigned to the home finding unit to organize the program of locating homes for juveniles. This court is aware that his efforts have paid substantial dividends. However, the court is also informed that he now expects to leave the home finding unit after less than one year of service.
It is fully appreciated that staff turnover is a difficult *367 problem in the field of child welfare.[7] However, the turnover in this particular unit (as well as among caseworkers assigned to child welfare services generally in this county) is extremely high and amounts to a substantial disability in the provision of services. It would have seemed desirable to have included in the plan a commitment to address this problem along with the description of a procedure and a timetable for securing its resolution.[8]
The plan contains no specification of foster home recruitment methods or procedures. Without such written procedures the skills and knowledge of a given caseworker may well become lost upon his leaving the agency or being transferred. Furthermore, training his replacement becomes immeasurably more difficult and time consuming. Such procedures might identify the target population, specify methods of effectively reaching that population and set forth programs designed to stimulate interest and encourage suitable candidates to accept the foster parent role.
The plan fails to identify the number of homes which should be held in an available reserved category in order to avoid prolonged delay in the placement of adjudicated juveniles. This could have been done by an assessment of previous placement in order to estimate anticipated future needs. The plan should also contain a description of the types of homes needed and their location within school systems capable of meeting the special educational needs of the child.
The foster parent training program does not include .any *368 formal preservice training or orientation. Such training seems essential to the development of a quality care program.[9] Of more critical concern is the fact that the plan does not require participation of all foster parents in the training program. It is recognized that such a requirement is sometimes opposed by certain foster parents and presents problems in implementation.[10] However, the necessity of such a program is too well documented to leave to optional involvement. Recertification would seem to be an appropriate time to obtain a commitment to involvement in the training program.
Furthermore, the plan lacks a timetable for implementing the various phases of the training program. Only by planned implementation will all phases of the training program be scheduled in a given time frame and repeated as necessary to continue to upgrade the skills of existing foster parents as well as to effectively reach new foster parents appointed after the program has been initiated.* [11]
The question next presented is which if any of the various deficiencies in the plan should this court at this time order the agency to correct. Various factors affect that decision. First, courts are most reluctant to interfere in the administrative practices of executive agencies.[12] Second, the agency should have an opportunity to work out its own administrative program within the scope of the goals it has established. Third, the experience in recent months has demonstrated a substantial improvement in the availability of foster homes for the court-placed juvenile in this county.
At the same time, the problem is by no means solved. The court is advised that within the last six months there have been juveniles who have waited 11 and 12 weeks respectively for placement following the initial request. The average wait has been four and one-half weeks.[13]
It is appreciated that there will likely be some delay associ *369 ated with the placement of juveniles under the best of circumstances. Time is required for matching the needs of the child with the abilities of the foster parent as well as the planned introduction of the child into the foster home. However, the delay associated with these procedural aspects of the matter could be held to a minimum if an appropriate selection of foster homes were continuously available. Such a reserve of foster homes seems to be accepted practice among foster care agencies. Furthermore, the alternative means a return to the former system in this county wherein the search was not commenced until after the request was made which of necessity introduces substantial delay into the placement process. The failure to make a commitment to establish a reserve of available foster homes becomes a critical deficiency in the plan.
Directly associated with the need for a reserve of available foster homes is the need for training of foster parents. Training directly impacts the availability of foster homes. Foster parents uncomfortable about accepting the court-placed juvenile gain confidence with preplacement orientation and the assurance of subsequent ongoing training. However, the failure of the plan to establish a timetable for implementation of the foster parent training program, and the failure of the plan to require involvement of foster parents in the training program will substantially reduce its impact. This becomes the second critical deficiency of the plan. The court can have no assurance that the foster parent training program will achieve its objectives unless it is systematically implemented and all foster parents required to be involved.[14]
It does not seem appropriate for the court at this time to establish standards for the agency to follow as was done in *370 Matter of Martarella v Kelley.[15] It would seem sufficient to direct attention to the need for an available reserve of homes and direct that a timetable be devised and filed with the court whereby all foster parents will be systematically involved in the training program. The problems which gave rise to this proceeding should be resolved by the fulfillment of the commitments made in the plan together with these two additional items. Therefore, the order in this case is limited to the following:
1. Directing that the St. Lawrence County Department of Social Services in co-operation with the County Probation Service determine the number, type and location of foster homes to be held in available reserve for the court-placed juvenile.
2. Directing the establishment of a timetable for the systematic implementation of the foster parent training program for all foster parents.
No action is taken in this proceeding on the other criticisms noted herein.[16] Nor should this decision be construed as approval or disapproval of the plan.[17] It is sufficient that there is a plan in existence which seems reasonably designed to provide suitable foster homes for the court-placed juvenile without unreasonable delay in the placement process. It is assumed that the agency will in good faith move forward with the fulfillment of the commitments made therein.

. Family Ct Act, § 255.

. Matter of Edward M, 76 Misc 2d 781, affd 45 AD2d 906.

. Edward M, supra, p 791.

. It should be noted that the scope of this decision is limited to consideration of the agency plan for providing foster homes. It does not consider preplacement functions and procedures, treatment functions and procedures during placement or postplacement functions and procedures.

. Helen D. Stone and Jeanne M. Hunzeker, Education for Foster Family Care: Models and Methods for Foster Parents and Social Workers, Child Welfare League of America, Inc., Foster Parents Project, 1974, p 1-3.

. The training program syllabus includes a study of the respective roles of foster parents and agency caseworkers. In this connection it is interesting to note recent changes in the conceptualization of the role of the foster parent vis-á-vis the agency and the child. See David Fanshel, The Role of Foster Parents in the Future of Foster Care, in Foster Care in Question, Child Welfare League of America, 1970, p 228. Also see a recent memorandum from the Child Welfare League of America to member agencies dated May 7,1975 in which this change in role is described.

. Bernice Boehm, The Child in Foster Care, in Foster Care in Question, Child Welfare League of America, 1970, p 224.

. Esther Glickman, in her article, Treatment of the Child in Foster Care, describes the direct link between staff turnover and staff training. After commenting that child welfare services are often carried out in a mechanical and superficial fashion, she continues: "What is needed to correct this kind of practice is seeing to it that the workers, including those without professional education, have a thorough understanding of the concepts of growth and development of children, stressing the needs at the various maturational stages and the deviations wrought by deprivation and distortion of those needs, plus a knowledge of broad general outlines of mental health planning and handling for correction. Such information must be made viable to the staff, made more meaningful than the textbook knowledge of undergraduate or even graduate courses. The concepts should be demonstrated through case material showing the child’s and family’s needs, and how each possible foster care resource was discussed in accordance with such needs. Supervision of the child’s needs in his overall life situation and of his daily life happenings can be a valuable tool for the worker’s use, when linked to solid theory. Otherwise the worker is flying blind and feels frustrated on the job, a situation that contributes to rapid turnover of staff.” (Foster Care in Question, Child Welfare League of America, 1970, p 95.)

. Stone, op cit pp 21-40.

. Stone, Ibid., p 41.

. It would seem that a procedural manual would correct many of the defects which have been described herein. Such a manual, complete with flow charts, is recognized as a basic ingredient of any managerial system. A procedural manual could clearly and concisely set forth staffing patterns, staff qualifications, recruitment methods, training courses, and procedures for their implementation as well as a step by step description of each separate function of the organization.

. Matter of Gimprich v Board of Educ. of City of N. Y., 306 NY 401; Matter of Community Action Against Lead Poisoning v Lyons, 43 AD2d 201; but, see, Matter of McCoy v Mayor of City of N. Y., 73 Misc 2d 608, affd 41 AD2d 929.

. Twelve juveniles have been placed in foster care by court order since the first of *369 the year. One was placed immediately, two were placed within one week, five were placed within four weeks, two were placed at 11 and 12 weeks and two remain unplaced after six and eight weeks. (Computed from date of probation request for a foster home.)

. It is significant to note that both under the present provisions of part A of title IV of the Social Security Act (49 US Stat 620, as amd by 81 US Stat 911) and under new title XX effective October 1, 1975 of the same act, Federal aid for training child welfare personnel continues at 75% of the cost of providing such training. Since the State pays one half of the remainder, the ultimate local cost is only 12 and Vi%. Furthermore, it appears from the proposed rules of the Department of Health, Education and Welfare implementing title XX (45 CFR 228.81, 228.47; 40 Fed Reg 27364, 27360) (rules 228.81 and 228.47) similar aid is available for training foster parents. Also it appears that there is no limitation to the dollar amount of Federal reimbursement under the present act or under title XX since training of personnel is explicitly excluded from the allotment limitations applied to other service programs.

. 359 F Supp 478.

. Even though certain of these criticisms, such as the staff turnover problem, directly affect the disposition of cases before this court, they are here left to managerial discretion. This does not mean they are immune from further judicial scrutiny and action under section 255 of the Family Court Act upon a proper showing that their effect is to render meaningless the lawful order of the court.

. It needs also to be noted that comment has been purposely avoided on certain items in the plan such as the completion of forms for certification of foster homes. Also no comment is made on the operation of the agency boarding home, detention facilities or proposed temporary shelter for the reason that their services are not directly within the scope of the subject matter of this proceeding.