OPINION OF THE COURT
Claire T. Pearce, J.
In the above-referenced dockets this court found that the subject children are neglected pursuant to Family Court Act § 1051 (a), and directed the petitioner, the Commissioner of Social Services (CSS), to investigate and report on recommendations as to appropriate orders of disposition in each case in accordance with Family Court Act § 1052 (a).
In every instance the CSS has presented evidence substantiating the necessity for his recommendation of placement away from the respondent parent or guardian, and he has denominated either a remote relation (i.e., a person not coming within the third degree of blood kinship as set out under Social Services Law § 375) or a friend as the most appropriate caretaker for the duration of the placement.
The petitioner maintains that the named caretakers are disqualified to be certified as "kinship foster parents” for whom there is an expedited and modified certification process (18 NYCRR 444.8). Therefore, he contends it is necessary for these persons to be certified (if they can qualify)[2] under the usual procedures (18 NYCRR 443.3). In the usual course of CSS’ business such certifying process takes at least four months. In fact some cases are uncertified after a period of 18 months. (See, Matter of M., Fam Ct, Kings County, dockets Nos. N50-52/86, transcript, May 20, 1988, at 3; Matter of Mc. Children, Fam Ct, Kings County, docket No. N13716/87, transcript, Mar. 14, 1988, at 8.)
The CSS further argues that pending such certification, or other appropriate action, it is beyond his scope of authority to accept these children into placement while allowing them to continue to reside with their present caretakers. Moreover he asserts that to remove them from their present living arrangements is contrary to their present needs and acknowledges *953 that such a move could even prove detrimental in some cases. (Matter of Coop, Fam Ct, Kings County, docket No. N1659/87, transcript, Nov. 18, 1987 and Dec. 16, 1987.) Therefore he concludes that the court is placed upon the horns of a dilemma: either to place the children "directly” with each caretaker (Family Ct Act § 1055 [a]) or to place them with CSS; in which case he assures they will be immediately ripped from the homes where they have established stability and warm, nurturing relationships and cast into homes of certified, well-intentioned, but nevertheless, unknown and perhaps unknowing strangers.
In each of these cases the circumstances of the caretakers are less than ideal, although according to CSS they are presently adequate. Not one of the caretakers has been shown to be a person of sufficient independent resource and means to undertake the care and custody of these neglected children without sustained oversight, intervention and provision of services.[3] In fact in each case CSS acknowledges that a placement with the Commissioner in accordance with Family Court Act § 1052 (a) (iii); § 1055 and Social Services Law § 398 is the preferred disposition and would have been recommended but for the view of the agency that financial reimbursement for foster care maintenance fees may be implicated or jeopardized here.
Therefore the court finds, based upon the facts adduced in each case as to the particular needs of the children and/or caretaker, that each denominated caretaker is not "suitable” as a person to accept custody pursuant to an order of "direct” placement under Family Court Act § 1055 (a), and moreover, that placement with CSS is appropriate and required in order to assure a realistic expectation of efforts toward rehabilitation and reunification for the respondents and the receipt of on-going services to the children and caretakers, such as financial and other supports, case management, and continuous oversight to serve each child’s best interests. (Family Ct Act § 1055 [c]; 18 NYCRR part 430; 86 ADM 33.)[4]
*954 Indeed, historically, distant relatives and friends have been recognized and utilized by CSS as "resources” for both remands and long-term placements in much the same way as kinship homes were and are used presently. In addition to being "alternatives to placement” these "resources” are analogous to blood kin and require special treatment in the approval process rather than being likened to totally unrelated persons making disinterested applications to an agency for certification as foster parents. (See, 86 ADM 33 [historical reference]; Guide to the Child Welfare Reform Act [CWRA], at 53-54.) A New York State Department of Social Services (SDSS) directive or administrative letter (ADM) which, in effect, promulgates a change in this policy is dated September 26, 1986.
This new policy was generated, at least in part, by the efforts of various advocacy groups and agencies in the field, including the Legal Aid Society, culminating in the initiation of litigation (Matter of Eugene F. v Gross, Sup Ct, NY County, index No. 1125/86) to secure equitable standards for receipt of foster care maintenance fees for "kinship homes”, i.e., relatives within the third degree of blood kinship, caring for children who were "boarded out”[5] by CSS. (Guide to CWRA, op. cit.)
*955 The resultant policy and procedural changes appearing in 86 ADM 33, which purport to "define” "foster care”, and "foster child” and to "clarify” and "make consistent” existing regulations, fail to address the unique position held by placement resources such as friends and distant relatives and directly conflicts with State law (see, supra, at 954, n 5 [statutory definitions]; see also, Matter of Jones v Berman, 37 NY2d 42, 51).
It can be readily seen that SDSS by "redefinition” forecloses local commissioners and "authorized agencies”[6] from their statutory jurisdiction and responsibility to "place out”[7] children, and thereby effectively repeals part of Social Services Law § 371 (12) and Social Services Law § 374 (1) which it patently has no authority to do. (McKinney’s Cons Laws of NY, Book 1, Statutes § 371; Matter of New York Life Ins. Co. v State Tax Commn., 80 AD2d 675, affd 55 NY2d 758; Matter of Jones v Berman, supra; Matter of Trump-Equitable Fifth Ave. Co. v Gliedman, 57 NY2d 588.) CSS clearly still has the statutory mandate to "place out” a child in a "family free home”[8] not only for the purpose of adoption but "for the provision of care” (Social Services Law § 371 [12]). Under prior practice children "placed out” in circumstances such as these could receive assistance under independent funding sources outside of AFDC(FC) (foster care maintenance fees), i.e., Emergency Assistance to Needy Families with Children (EAF) (Social Services Law § 350-j; see, Matter of Jones v Berman, supra), Home Relief (HR) (Social Services Law § 158; see, Matter of Lee v Smith, 87 Misc 2d 1018, affd 58 AD2d 528, affd 43 NY2d 453), Aid to Families with Dependent Children (AFDC) (Social Services Law §§ 349, 350), Veterans Assistance (VA) (Social Services Law § 169)—in accordance with applica *956 ble State and Federal statutory and case law. (Social Services Law § 62 [1]; Matter of Jones v Berman, supra.)
CSS argues, somewhat tautologically, that these sources of funding are now totally unavailable, by regulations of SDSS, which according to CSS’ memorandum of law, provide: AFDC is excluded "when [a child] is residing, with a relative if * * * placement is on a board basis” and "home relief is not foster care”. He concludes "[T]hus, the Commissioner cannot 'place out’ or 'board out’ a child in his care, custody or guardianship in a home and then pay for the care of the child through the public assistance program. Any payments made must be through the foster care program.” (Emphasis supplied.) No statutory authority other than SDSS regulations is cited to support a contention that categorical assistance other than AFDC/FC is unavailable to a ward of CSS "placed out” by him. (See, Social Services Law § 62 [1].)
From the court’s independent analysis of the relevant statutes, case law, and submission it would appear that SDSS has elected (at great expense to CSS’ ability to creatively and flexibly address individual needs of neglected children) to disregard the provisions of Social Services Law § 371 (12) (except perhaps for the purposes of establishing preadoptive homes) in its definition of CSS’ responsibility and scope of authority. Although this may result in a maximization of AFDC/FC (foster care maintenance fees) reimbursement, and also helps ensure compliance with utilization review standards whenever children are in the care and custody of local commissioners, it goes beyond SDSS’ power to interpret and regulate legislative mandate and authority. It should be noted that New York State’s statutory scheme and definitions for the care of destitute and/or neglected children are not in conflict with Federal legislation in this area as the standards and definitions set Federally apply only to reimbursement. (Federal Foster Care Payments and Adoption Assistance Act [42 USC §§ 670, 671, 672]; Social Services Law § 153 [a], [b], [d]; § 409 [e]; 18 NYCRR 430.8.) However laudable the goal, lawful amendment is clearly required to correct the present anomaly between statutory and regulatory definitions of responsibility and authority of "authorized agencies”. Regulatory reevaluation regarding the certification process for placements such as these also seems warranted, and is recommended by the court.
Because the issue presented is raised within the context of dispositional hearings under article 10 (Family Ct Act §§ 1052, 1055) to which the Commissioner of the State Department of *957 Social Services (SDSS) is not a party, SDSS has not had an opportunity to appear or be heard on the issue of its cooperation and assistance in securing appropriate placement in the best interest of the subject children in accordance with the provisions and mandates of Social Services Law § 371 (12); §§ 374, 398, 384-b, 409-e; Family Court Act §§ 1055, 1052; 18 NYCRR 430.8, and because CSS properly demurs, citing Matter of Beaudoin v Toia (45 NY2d 343, 347; see also, Brooklyn Socy. for Prevention of Cruelty to Children v Blum, 83 AD2d 820) for the proposition that "local commissioners are agents of the State department [and] they may not substitute their interpretations of the regulations of the State department for those of the State department or the State commissioner”; the court presently declines to direct CSS to "place out” the subject children in "family free homes” and provide public assistance where appropriate in accordance with provisions under statutory authority and mandate unless or until certification of the caretakers is effected. This determination is, of course, without prejudice to the bringing of a CPLR article 78 proceeding by a proper party in the Supreme Court, or a motion on notice to SDSS for an order under Family Court Act § 255 in an appropriate action pending in the Family Court.
CSS maintains that such an order under Family Court Act § 255 is beyond the scope of the court’s authority. However, the authority cited for his position is inapposite and not supported by relevant statutory and case law (Besharov, Practice Commentary, McKinney’s Cons Laws of NY, Book 29A, Family Ct Act § 255, at 237; Matter of Edward M, 76 Misc 2d 781; Matter of Murcray, 45 AD2d 906; see also, Matter of Lorie C., 63 AD2d 1073, affd 49 NY2d 161, 172).
While it is correct that a detailed and explicit direction to SDSS as to how they should effect the result of compliance with their statutory authority and mandates might under certain circumstances be construed as unenforceable (Matter of Lorie C., supra), an order to cooperate and assist in securing placement in conformity with the law and to design a procedure whereby relatives and friends may be meaningfully utilized as placement resources in accordance with statutory authority and the often-cited intent of the Legislature (see, Social Services Law § 384-b) appears well within the scope of this court’s jurisdiction and powers. Such a direction, if found to be appropriate and necessary after a hearing, should leave to the judgment and discretion of SDSS the modality of *958 compliance, the allocation or reallocation of resources and priorities and should not intrude the court’s oversight or judgment into its processes. (CWRA Guidelines; Matter of Lorie C., supra.) Therefore it is clear that a properly crafted order issued after an opportunity to be heard which takes into account full cognizance of the court’s function and sphere of authority and the agency’s integrity and administrative prerogatives could be utilized to appropriately effect the best interests of neglected children placed with CSS by the court.
However, a preferable course under these circumstances remains open to this court; an obvious avenue out of the administrative rather than judicial dilemma presented here, which is given recognition by CSS in his submission. That is, to expedite or speed up the process of the CSS’ certifications. Presently a maximum of four months is allotted for completion of the certification procedure. No minimum time frame is promulgated in law or regulation, and CSS acknowledges no serious consideration of an expedited procedure. In fact, if CSS simply complied with the timetable set out in the regulations the problem here would be avoided in almost every case. Failure of efforts at over-all compliance by CSS is quite evident.
However, given that in most of these instances a considerable amount of information on the individuals or families subject to being certified is known very early in the process of litigation, the CSS has ample opportunity to institute a process which extrapolates information and coordinates and consolidates aspects of preparation for both litigation, and certification within analogous time frames and provisions for certification found in 86 ADM 33. If such a procedure were initiated promptly at the time of identification of the placement resource these persons could have completed certification at the time of final court disposition. The position offered by the CSS that expediting the process could not meet with success due to his lack of authority or ability to influence other "authorized agencies” to speed up their processes is wholly unconvincing. Additionally, CSS directly operates an "authorized agency” empowered to certify foster parents.
Therefore, pursuant to Family Court Act § 255 (see, Matter of Murcray, supra), this court directs the CSS to review his current procedures for certification of distant relatives and friends of neglected children (or children alleged to be neglected) with a view to identifying and establishing ways of prioritizing such certifications so that disruptions in care are *959 routinely avoided, and further directs that CSS cooperate with SDSS and other "authorized agencies” to secure their assistance in expediting these certifications.
Finally the court places each of the subject children, for a period not to exceed 18 months effective the date of this order, in the care and custody of the CSS with the direction that their present caretakers be certified, where qualified, in a manner designed to ensure continuity of caretakers and each child’s best interests.

. Some caretakers are described as "too old”, or having health conditions which although not disabling, may be disqualifying; others may fail to meet qualifications as to housing standards. (See, 86 ADM 33, at 5 [for housing standards for kinship homes approval].) (See, Matter of K. Children, Fam Ct, Kings County, docket No. N1115/88, transcript, Mar. 29, 1988, at 16; Matter of B. Children, Fam Ct, Kings County, docket No. N1615-6/88, transcript, Mar. 30, 1988, at 10.)

. See 86 ADM 33 for an explanation of the history, rationale, and criteria for certification of "kinship foster homes.” The extension of the rationale for placement with CSS of children residing with distant relatives and friends, where appropriate, appears logical and compelling.

. Far from being isolated instances, these cases represent a small but significant segment of the foster care population as seen in the everyday course of events in Family Court. Given the CSS’ exemplary mandate to reunite rather than estrange families and to place children with relatives *954 and friends in the least restrictive setting, i.e., the most homelike setting consistent with safety and serving their needs (Social Services Law § 398; 18 NYCRR 430.11; Guide to the Child Welfare Reform Act Law Juvenile Rights Div, at 19-21) it would appear that instances such as these will increase rather than diminish.

. Statutory Definitions:
" 'Board out’ * * * to arrange for the care of a child in a family, other than that of the child’s parent, step-parent or legal guardian, to whom payment is made or agreed to be made for care and maintenance.” (Social Services Law § 371 [14].)
" 'Place out’ * * * to arrange for the free care of a child in a family other than that of the child’s parent, step-parent, grandparent, brother, sister, uncle, or aunt or legal guardian, for the purpose of adoption or for the purpose of providing care”. (Social Services Law § 371 [12].)
" ’Home’ includes a family boarding home or a family free home.” (Social Services Law § 371 [15].)
" 'Dependent child’ * * * a child who is in the custody of, or wholly or partly maintained by an authorized agency or an institution, society or other organization of charitable, eleemosynary, correctional, or reformatory character”. (Social Services Law § 371 [7].)
" 'Authorized Agency’ * * *
"(a) Any agency, association, corporation, institution, society or other organization which is incorporated or organized under the laws of this state with corporate power or empowered by law to care for, to place out or to *955 board out children, which actually has its place of business or plant in this state and which is approved, visited, inspected and supervised by the department or which shall submit and consent to the approval, visitation, inspection and supervision of the department as to any and all acts in relation to the welfare of children performed or to be performed under this title,
"(b) Any court or any social services official of this state authorized by law to place out or to board out children or any Indian tribe that has entered into an agreement with the department pursuant to section thirty-nine of this chapter”. (Social Services Law § 371 [10].)

. See, n 5, supra.

. See, n 5, supra.

. See, n 5, supra.